**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DR. JEFFREY MILTON, DDS, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD CASUALTY INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 3:20-cv-00640-JBA |

**PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

Oral Argument Requested

**TABLE OF CONTENTS**


I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ………………………... 1

II. FACTUAL BACKGROUND ………………………………………………………… 5

III. LEGAL STANDARD ……………………………………………………………… 6

IV. CHOICE OF LAW AND RULES OF POLICY INTERPRETATION ………………..… 7

V. ARGUMENT ……………………………………………………………………… 8

A. Defendant Cannot Meet Its Burden of Establishing That an Exclusion Applies …8

1. "Fungi", Wet Rot, Dry Rot, and Bacteria Denote Wood Disease, Thus, Under Connecticut Law, "Virus" Also Denotes Wood Disease … 9

2. Defendant Forsook the 2006 ISO Endorsement, But Now Invokes the Broad Meaning of "Virus" From That Endorsement to Withhold Coverage ……………………………………………… 12

3. Defendant Offers No Controlling Authority to Retroactively Expand the Exclusion for Fungi, Wet Rot, Dry Rot, Bacteria, and Virus to COVID-19 ……………………………..………………12

4. If the "Virus" in the Policy is Construed to Include COVID-19, Plaintiff's Claims Are Covered by the Limited Fungi, Bacteria, or Virus Coverage ……………………………………………….. 14

B. Plaintiff Has Sufficiently Alleged Direct Physical Loss of or Physical Damage to Property ……………………………………………… 19

C. Plaintiff is Entitled to Civil Authority Coverage ……………………………... 32

VI. CONCLUSION ……………………………………………………………… 38

**TABLE OF CASES**

*54th Street Ltd. Partners, L.P. v. Fidelity & Guar. Ins. Co.*,
306 A.D.2d 67 (N.Y. App. Div. 2003) …………………………………………………………… 36

*Abner, Herrman & Brock, Inc. v. Great N. Ins. Co.*,
308 F. Supp. 2d 331 (S.D.N.Y. 2004) ……………………………………………………………. 36

*Advance Cable Co., LLC v. Cincinnati Ins. Co.*,
788 F.3d 743 (7th Cir. 2015) ……………………………………………………………...… 25

*Affiliated FM Ins. Co. v. Owens-Corning Fiberglass Corp.*,
16 F.3d 684 (6th Cir. 1994) ………………………………………………………………………. 26

*Allen Park Theatre Co. v. Michigan Millers Mut. Ins. Co.*,
210 N.W.2d 402 (Mich. Ct. App. 1973) ………………………………………………………….. 33

*Altru HealthSys. v. Am. Prot. Ins. Co.*,
238 F.3d 961 (8th Cir. 2001) ……………………………………………………………….... 36

*Atwells Realty Corp. v. Scottsdale Ins. Co.*,
2021 WL 2396584 (R.I.Super June 4, 2021) …………………………………………..……. 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ……………………………………………………………………….….. 1, 6

*Barnes v. Winchell*,
105 F.3d 1111 (6th. Cir. 1997) ………………………………………………………………….. 2

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) …………………………………………………………..………………….. 1, 6

*Blue Springs Dental Care, LLC. Owners Ins. Co.*,
488 F. Supp. 3d 867 (W.D. Mo. 2020)…………………………………………………... 3, 34, 35

*Brown's Gym, Inc. v. The Cincinnati Ins. Co.*,
2021 WL 2953039 (Pa.Com.Pl. Jul 13, 2021) …………………………………. 19, 23, 24, 28, 34

*Brunswick Panini's v. Zurich Am. Ins. Co.*,
2021 WL 663675 (N.D. Ohio Feb. 19, 2021) ……………………...………………………….36

*Cheshire Mortg. Serv., Inc. v. Montes*,
612 A.2d 1130 (Conn. 1992) ……………………………………………………………………….. 10

*Connecticut Med. Ins. Co. v. Kulikowski*,
942 A.2d 334 (Conn. 2008) ………………………………………………..……………… 1, 13

*Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*,
2020 WL 7258114 (Ohio Ct. Com. Pl. Nov. 17, 2020) ………………………………………... 3, 35

*Dundee Mut. Ins. Co. v. Marifjeren*,
587 N.W.2d 191 (N.D. 1998) ………………………………………………………………….. 26

*EDO Corp. v. Newark Ins. Co.*,
878 F.Supp. 366 (D. Conn. 1995) ………….…………………………………………………….. 24

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*,
2020 WL 7249624 (E.D. Va. Dec.9, 2020) ………………………………………………..… 20

*England v. Amica Mut. Ins. Co.*,
2017 WL 3996394 (D. Conn. 2017) …………………………………………………………… 19

*Essex v. BloomSouth Flooring Corp.*,
562 F.3d 399 (1st Cir. 2009) ........................................................................................... 20

*Family Tacos, LLC v. Auto Owners Ins. Co.*,
2021 WL 615307 (N.D. Ohio Feb. 17, 2021) ……………………………………………….. 36

*Fayette Cty. Housing Auth. v. Housing & Redev. Ins. Exch.*,
771 A.2d 11 (Pa. Super. 2001) ……………………………………………………………..…24

*Fiallo v. Allstate Ins. Co.*,
138 Conn.App 325 (2012) ……………………………………………………………………... 32

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d. Cir. 2000 ………………………………………………………..……… 6

*Gen. Mills, Inc. v. Gold Medal Ins. Co.*,
622 N.W.2d 147 (Minn. Ct. App. 2001) ……………………………………………..………23

*Gibson v. Scap*,
960 F.Supp.2d 373 (D. Conn. 2013) ………………………………………………………... 30

*Gomolka v. State Auto. Mut. Ins. Co.*,
436 N.E.2d 1347 (Ohio 1982) ……………………………………………………………….. 37

*Goodwill Indu. Of Orange Cnty. Cal. v. Phila. Indem. Ins. Co.*,
2021 WL 476268 (Super. Ct. Cal. Orange Cty. Jan. 28, 2021) ……………………………... 2, 29

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*,
2014 WL 6675934 (D.N.J. Nov. 25, 2014) …………………………………………………. 30

*Hajer v. Ohio Security Ins. Co.*,
2020 WL 7211636 (E.D. Texas (2020) ………………..……………….…………………… 22

*Haymond v. Statewide Grievance Comm.*,
723 A.2d 82 (Conn. Supp. 1997) ……………………………………..……………………… 7

*Henderson Road Rest Sys., Inc. v. Zurich Am. Ins. Co.*,
2021 WL 168422 (N.D. Ohio Jan. 19, 2021) ………. passim

*Heyman Assocs. No. 1. v. Ins. Co. of State of Pa.*,
653 A.2d 122 (Conn. 1995) ………………………………………………………….... 13, 37

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ……………………………………………………………………..….. 6

*Independence Barbershop, LLC v. Twin City Fire Ins. Co.*,
2020 WL 6572428 (W.D. Tex. Nov. 4, 2020) ………………………………………….… 18

*In re Mercator Software, Inc. Securities Litigation*,
161 F. Supp.2d 14 (D. Conn. 2001) …………………………………………...…………… 6

*In Re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig. ("Society")*, 2021 WL 679109 (N.D. Ill. Feb., 22 2021) ……………………………………………………….. *passim*

*Karas v. Liberty Ins. Corp.*,
33 F.Supp.3d 110 (D. Conn. 2014) ……………………………………………………….. 24

*Kelly v. Figueiredo*,
610 A.2d 1296 (Conn. 1992) ………………………………………………………….… 8

*Legacy Sports Barbershop, LLC v. Continental Cas. Co.*,
2021 WL 2206161 (N.D.Ill. 2021) ……………………………………………..….…. 28, 29

*Lexington Ins. Co. v. Lexington Healthcare Group*,
311 Conn. 29 (2014) …………………………………………………………...……. 7, 12

*Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*,
967 A.2d 1 (Conn. 2009) ……………………………………………………………….... 8

*Loeffler v. Staten Island Univ. Hosp.*,
582 F.3d 268 (2d. Cir. 2009) ………………………………………………………………… 30

*Mason Cap., Ltd. v. Kaman Corp.*,
2005 WL 2850083 (D. Conn. Oct. 31, 2005) …………………………………………...…10

*McKinley Development Leasing Company Ltd., et al v. Westfield Ins. Co.*,
2020 WL 7265230 (Ohio Com.Pl. Oct. 21, 2020) ………………………………………….. 34

*Michael Cetta, Inc. v. Admiral Indem. Co.*,
2020 WL 7321405 (S.D.N.Y. Dec. 11, 2020) ………………………………………. 2, 29

*Mohammed v. Tritten*,
2020 WL 2750836 (D. Minn. 2020) ……………………………………………………… 31

*Motorists Mut. Ins. Co. v. Hardinger*,
131 F. App'x. 823 (3d Cir. 2005) …………………………………………………..... 20, 23

*Murray v. State Farm Fire & Casualty Co.*,
509 S.E.2d 1 (W. Va. 1998) ………………………………………………………………. 22

*Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*,
2002 WL 31247972 (E.D. Pa. Sept. 30, 2002) …………………………………….... 36

*Nationwide Mut. Ins. Co. v. McHugh*,
2001 WL 1706752 (Conn. Super. Ct. Dec. 19, 2001) ………………………….……… 8, 11

*NECO, Inc. d/b/a Play It Again Sports v. Owners Ins. Co.*,
2021 WL 601501 (W.D. Mo. Feb. 16, 2021) …………………………………………….. 30

*Netherlands Ins. Co. v. Main St. Ingredients, LLC*,
745 F.3d 909 (8th Cir. 2014) ……………………………………………………………. 29, 30

*Newman Myers Kreines Gross Harris, P.C. v. Great American Northern Ins. Co.*,
17 F.Supp. 3d 323 (S.D.N.Y. 2014) ………………………………………………………… 20

*North State Deli, LLC v. Cincinnati Ins. Co.*,
2020 WL 6281507 (N.C. Super. Ct. Durham Cty. Oct 9, 2020) ………………………...… 21, 26

*O'Brien v. U.S. Fid. & Guar. Co.*,
669 A.2d 1221 (Conn. 1996) ……………………………………………………….……. 1, 7

*Otis Elevator Co. v. Factory Mut. Ins. Co.*,
353 F.Supp. 2d 274 (D. Conn. 2005) ……………………………………………………..… 7

*Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020),
*cert denied sub nom., Republican Party of Pennsylvania v. Degraffenreid*,
141 S.Ct. 732 (U.S. 2021) ……………………………………………………..……….. 24

*Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*,
806 N.Y.S.2d 709 (N.Y. App. Div. 2005) ……………………………………………... 23

*Perry Street Brewing Co., LLC v. Mut. Of Enumclaw Ins. Co.*,
2020 WL 7258116 (Wash. Super. Ct. Nov. 23, 2020) …………………………………………. 21

*Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*,
311 F.3d 226 (3d Cir. 2002) ……………………………………………………….……… 20

*Pure Fitness LLC v. Twin City Fire Ins. Co.*,
2021 WL 512242 (N.D. Ala. Feb. 11, 2021) …………………………………………….… 9, 14

*Robert E. Levy, D.M.D., LLC v. Hartford Fin. Servs. Grp. Inc.*,
2021 WL 598818 (E.D. Mo. Feb. 16, 2021) ………………………………………….. 14, 37

*Roberts v. Liberty Mut. Fire Ins. Co.*,
264 F.Supp.3d 394 (D. Conn. 2017) ………………………………………………….… 7, 24

*R.T. Vanderbilt Co. v. Cont'l Cas. Co.*,
870 A.2d 1048 (Conn. 2005) ……………………………………………………….…… 1, 7

*R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*,
216 A.3d 629 (Conn. 2019) …………………………………………………….....….. 8, 11

*Salon XL Color & Design Grp., LLC v. W. Bend Mut. Ins. Co.*,
2021 WL 391418 (E.D. Mi. Feb. 4, 2021) ……………………………………………...… 20

*Santo's Italian Café LLC v Acuity Ins. Co.*,
2020 WL 7490095 (N.D. Ohio 2020) ……………………………………………………….. 33

*S. Dental Birmingham LLC v. Cincinnati Ins. Co.*,
2021 WL 1217327 (N.D. Ala. Mar. 19, 2021) ………………………………………… 2, 32

*Sentinel Mgmt. Co. v. N.H. Ins. Co.*,
563 N.W.2d 296 (Minn. App. Ct. 1997) ……………………………………………….. 22

*Sloan v. Phoenix of Hartford Ins. Co.*,
207 N.W.2d 434 (Mich. 1973) ………………………………………………………………. 33

*Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Conn.*,
2007 WL 464715 (D. Or. 2007) ……………………………………………………. 23, 29

*Studio 417, Inc. v. Cincinnati Ins. Co.*,
478 F. Supp. 3d 794 (W.D. Mo. 2020) ……………………………………… 3, 26, 34, 35

*TRAVCO Ins. Co. v. Ward*,
715 F. Supp. 2d 699 (E.D. Va. 2010) *aff'd*, 504 F. App'x. 251 (4th Cir. 2013) ……………….. 23

*Ungarean DMD v. CAN*,
2021 WL 1164836 (Pa. Ct. Com. Pl. Mar. 25, 2021) ………………………….…... 2, 20, 26, 34

*Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co., Ltd.*,
2020 WL 5939172 (M.D. Fla. Sept. 24, 2020) ………………………………………..… 4, 11

*U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*,
578 N.E.2d 926 (Ill. 1991) ……………………………………………………………... 30

*Vermont Mut. Ins. Co. v. Ciccone*,
900 F. Supp. 2d 249 (D. Conn. 2012) …………………………………………….….. 8, 11

*Wakefern Food Corp. v. Liberty Mutual Fir Ins. Co.*,
968 A.2d 724 (NJ. App. Div. 2009) ………………………………………………………. 25

*Williams PLLC v. Cincinnati Ins. Co.*,
2021 WL 767617 (N.D. Ill. Feb. 28, 2021) ……………………………………...… 20, 26

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff Dr. Jeffrey Milton, DDS, Inc., dba Olentangy Pediatric Dentistry ("Plaintiff") brings this proposed class action seeking recovery of losses caused by COVID-19 and the resulting civil closure orders. Hartford Casualty Insurance Company ("Hartford" or "Defendant") sold property insurance to Plaintiff that provides coverage for business interruption losses ("the Policy").

Because Defendant's Motion to Dismiss Plaintiff's First Amended Class Action Complaint ("Motion") is under consideration, the allegations of the First Amended Complaint ("FAC") must be taken as true and construed in the light most favorable to Plaintiff. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Motion should be denied if Plaintiff, as it does here, raises a right to relief beyond the speculative level. *Id.*

Ultimately, this contractual dispute is governed by the intent of the parties as manifested in the language of the insurance policy. *See Connecticut Med. Ins. Co. v. Kulikowski*, 942 A.2d 334, 338 (Conn. 2008). Standard rules of policy interpretation instruct that this Court construe undefined terms according to their plain language as understood by ordinary lay people. *R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 870 A.2d 1048, 1059 (Conn. 2005), *quoting O'Brien v. U.S. Fid. & Guar. Co.*, 669 A.2d 1221, 1224–25 (Conn. 1996).

Here, this case turns on the phrases "direct physical loss of or damage to property," which is required for most of the Policy's coverage to apply, "prohibited access," which is required for the Civil Authority coverage of Defendant's policy to apply, and "fungi, wet rot, dry rot, bacteria, and virus," which denotes the scope of one endorsement.

The plain and ordinary meaning of "direct physical loss" reasonably includes loss of functionality of the insured premises like that caused by COVID-19 here and that Plaintiff has sufficiently alleged in the FAC. *See In Re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig. ("Society")*, 2021 WL 679109, *9 (N.D. Ill. Feb., 22 2021); *Henderson Road Rest Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 168422, *12-13 (N.D. Ohio Jan. 19, 2021). In addition, Plaintiff has adequately pled that COVID-19 was present on and structurally altered the surfaces of the property at their Covered Property, the property itself, and the ambient air therein. Those allegations suffice for coverage even if structural alteration of property is required for there to be direct physical loss or damage. *See, e.g., Goodwill Indus. Of Orange Cnty. Cal. V. Phila. Indem. Ins. Co.*, 2021 WL 476268, *3 (Super. Ct. Cal. Orange Cty. Jan. 28, 2021); *cf. Michael Cetta, Inc. Admiral Indem. Co.*, 2020 WL 7321405, at *10 (S.D.N.Y. Dec. 11, 2020). Defendant's factual disagreement with Plaintiff about whether COVID-19 was present at Plaintiff's property, can simply be cleaned away, and causes structural alteration of property is not a dispute that can be resolved at the motion to dismiss stage. *See Barnes v. Winchell*, 105 F.3d 1111, 1114 (6th. Cir. 1997). Even if Defendant's interpretation of direct physical loss of or damage were reasonable, so is Plaintiff's, resulting in an ambiguity that should be construed in Plaintiff's favor. *Henderson Road*, 2021 WL 168422, at *12.

Defendant's Motion with respect to Civil Authority coverage should be denied for similar reasons. Plaintiff has sufficiently pleaded the prerequisite of Civil Authority coverage – damage to property other than insured property. *See S. Dental Birmingham LLC v. Cincinnati Ins. Co.*, 2021 WL 1217327, at *6 (N.D. Ala. Mar. 19, 2021). Defendant's policy merely requires that an action of civil authority "prohibit access," not that the action completely and totally bars access. *Ungarean DMD v. CAN*, 2021 WL 1164836, *10 (Pa. Ct. Com. Pl. Mar. 25, 2021). It is sufficient,

as happened here, that the civil authority orders forbid customers and employees from using Covered Property for their intended purposes. Plaintiff's construction is supported by other COVID-19 business interruption decisions. *See Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F.Supp. 3d 867, 879 (W.D. Mo. 2020); *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F.Supp. 3d 794, 803-04 (W.D. Mo. 2020); *Dino Palmieri Salons, Inc. v. State Farm Auto. Mut. Ins. Co.*, 2020 WL 7258114, *5 (Ohio Ct. Com. Pl. Nov. 17, 2020). Again, even if Defendant's interpretation of the prohibit-access provision were reasonable, so is Plaintiff's, resulting in an ambiguity that should be construed in Plaintiff's favor. *Henderson Road*, 2021 WL 168422, at *12.

Although Defendant identified policy Form SS 40 93 07 05 as the "Limited Fungi, Bacteria or Virus Coverage" endorsement ("the Virus Coverage Endorsement") when it wrote the Policy, it now redubs the form a "Virus Exclusion," which incorrectly suggests unlimited scope for the form's exclusion and no scope for the form's coverage. An odd interpretation indeed, given that the endorsement's title says "Coverage," rather than "Exclusion."

Now, admittedly the Virus Coverage Endorsement not only purports to add an additional coverage to the Policy, it also adds an exclusion for a list of maladies that affect trees, timber, and timber products: "fungi, wet rot, dry rot, bacteria and virus." Defendant wants to, by interpretive fiat, expand the meaning of this list to encompass viruses that cause disease in human, but the exclusion only makes sense and pertains to the same class of things if the terms are understood to refer to types of wood diseases. Otherwise, it makes no sense to include wet rot and dry rot in the list. Wet rot and dry rot do not harm human health. All five terms, including virus, are forms of wood disease, but only two plausibly harm human health.

The canon of construction *ejusdem generis* requires that the specific scope of a class of terms limits the scope of the general term in the same class. When it drafted the policy, Defendant placed fungi, wet rot, and dry rot in the same list as virus. Fungi, wet rot, dry rot, bacteria, and virus all have one thing in common: they are types of wood diseases. Under *ejusdem generis,* that fact limits the scope of the more general terms "bacteria" and "virus" to wood disease. Damage by COVID-19 to surfaces made of wood and other materials is not wood disease, and the impairment alleged in the FAC is not wood disease. For example, a federal court in Florida applied the *ejusdem generis* canon of construction in finding that the same Limited Fungi, Bacteria or Virus Coverage endorsement does not encompass losses stemming from COVID-19:

> The virus exclusion states that Sentinel will not pay for loss or damage caused directly or indirectly by the presence, growth, proliferation, spread, or any activity of "fungi, wet rot, dry rot, bacteria or virus." … Denying coverage for losses stemming from COVID-19, however, does not logically align with the grouping of the virus exclusion with other pollutants such that the Policy necessarily anticipated and intended to deny coverage for these kinds of business losses.

*Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co., Ltd.*, 2020 WL 5939172 at * 4 (M.D. Fla. Sept. 24, 2020).

Defendant's interpretation is further weakened by the fact that Defendant could have easily included, but did not, the industry's standard-form virus exclusion pertaining to human health – the 2006 ISO "Exclusion of Loss Due to Virus or Bacteria" endorsement. If Defendant had really intended to exclude human viruses, why would it tuck that exclusion away in a Virus Coverage

Endorsement that pertains to such things as dry rot and wet rot instead of just taking the easy course of slapping on the pre-printed standard-form human virus exclusion.

If, however, the Court finds that Defendant did not limit virus to wood disease in the endorsement, then Defendant provided 30 days of Time Element coverage for losses from COVID-19 and the Closure Orders. The text of the endorsement plainly grants coverage for "virus" irrespective of whether virus is caused by a "specified cause of loss," like lightning or fire.

For these reasons and as discussed in more detail below, the Motion should be denied.

## II. FACTUAL BACKGROUND

Plaintiff's FAC describes Plaintiff's business and the impact of COVID-19 on its insured premises ("Covered Property"). The FAC alleges the presence of COVID-19 at Covered Property, the physical loss or damage Covered Property has suffered, the structural alteration to Covered Property surfaces and ambient air caused by COVID-19, and the loss and diminishment of the physical space of Covered Property caused by COVID-19. Attempting to refute the facts is not permitted at this stage in the litigation.

Plaintiff owns and operates Olentangy Pediatric Dentistry, located in Powell, Ohio and provides specialized dental care for infants, children, and adolescents. FAC ¶ 1. To protect its business in the event that it suddenly had to suspend operations for reasons outside of its control, Plaintiff purchased insurance coverage from Defendant, including property coverage, as set forth in Defendant's Special Property Coverage Form (Form SS 00 07 07 05) ("Special Property Coverage Form"). FAC ¶ 2, 25. The Special Property Coverage Form includes Business Income, Civil Authority, and Extra Expense coverage. FAC ¶ 3.

Plaintiff alleges COVID-19 spreads and physically damages and alters property, including the property's ambient air. And how it has harmfully infested Plaintiff's Covered Property. FAC ¶¶ 68, 69-71.

Consequently, Plaintiff was forced to suspend or reduce business at Covered Property due to COVID-19 and the resultant closure orders ("Closure Orders"). FAC ¶ 10. Defendant has refused on a wide scale and uniform basis to pay its insureds, including Plaintiff, under their property insurance policies for losses suffered due to COVID-19 and related Closure Orders and costs incurred to prevent further property damage or to minimize the suspension of business and continue operations. FAC ¶ 20, 77-80.

## III. LEGAL STANDARD

Defendant's Motion fails on the merits, as detailed below. A motion to dismiss must be denied when the complaint's factual allegations, taken as true, "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At this stage of the proceedings, the pleadings must be taken as true, "even if doubtful in fact," and construed in the light most favorable to the plaintiff. *Id.; see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining "the plausibility standard is not akin to a 'probability requirement'"); *In re Mercator Software, Inc. Securities Litigation*, 161 F. Supp.2d 14, 147 (D. Conn. 2001) (providing that a the court must accept all of the complaint's factual allegations as true and must draw all reasonable inferences in favor of the plaintiffs) *citing Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d. Cir. 2000). The purpose of a motion under Rule 12(b)(6) "is to test the formal sufficiency of the statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts of the substantive merits of the plaintiff's case." WRIGHT & MILLER, 5B FEDERAL PRACTICE & PROCEDURE § 1356 & n.1 (3d ed. Oct. 2020). Where the plaintiff's allegations "state a claim to relief that is plausible on its face," *i.e.*, when there is "more than a sheer possibility that a defendant has acted unlawfully," the motion should be denied. *Ashcroft*, 556 U.S. at 678; *see* also *In Re Mercator Software, Inc. Securities Litigation*, 161 F.Supp.2d 143, at 147 *citing Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (providing that

"dismissal is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations).

## IV. CHOICE OF LAW AND RULES OF POLICY INTERPRETATION

When neither party asserts that an actual conflict of laws between the particular jurisdictions in question exist, there is no need for a choice-of-law analysis. *See Otis Elevator Co. v. Factory Mut. Ins. Co.*, 353 F.Supp. 2d 274, 279 (D. Conn. 2005) (citing *Haymond v. Statewide Grievance Comm.*, 723 A.2d 821, 826 (Conn. Supp. 1997)). As a result, Connecticut law applies to this case by default because it is the law of the forum and neither party has identified an actual conflict of laws between Ohio and Connecticut.

The interpretation of an insurance policy is a question of law determined by the intent of the parties. *Connecticut Med. Ins. Co*, 942 A.2d 334, at 338. If the terms of the policy are clear and unambiguous, those terms are given their natural and ordinary meaning. *Id.* Courts should "look at the contract as a whole," and "consider all relevant portions together." *Id.* "A provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." *Lexington Ins. Co. v. Lexington Healthcare Group*, 311 Conn. 29, 37-38 (2014). "It is a basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters, and that ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 870 A.2d 1048, 1059 (Conn. 2005), *quoting O'Brien v. U.S. Fid. & Guar. Co.*, 669 A.2d 1221, 1224–25 (Conn. 1996); *see also Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F.Supp.3d 394 (D. Conn. 2017) (providing that any reasonable interpretation of the policy resulting in coverage of the insured must be adopted). Thus, when Courts interpret policy exclusions, they must construe ambiguous exclusions, and ambiguities in

exclusions, in favor of the insured absent "'a high degree of certainty' that the policy language clearly and unambiguously excludes the claim." *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 967 A.2d 1, 22 (Conn. 2009), *quoting Kelly v. Figueiredo*, 610 A.2d 1296 (Conn. 1992); *R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*, 216 A.3d 629, 641 (Conn. 2019).

## V. ARGUMENT

Defendant moves for dismissal of Plaintiff's claims, contending they are barred by a Virus Coverage Endorsement and because Plaintiff has failed to allege any direct physical loss or damage to property, as required by all provisions of the Policy under which it seeks coverage: the Business Income, Extra Expense, and Civil Authority provisions. Motion ¶¶ 1-3, 8-22. However, the exclusion Defendant points to is inapplicable and the FAC's factual allegations are sufficient to show direct physical loss of or damage to Covered Property under the Policy. It is hardly worth noting that Defendant's argument is also at war with itself: if virus does not cause direct physical loss or damage, such that it would be covered under a property insurance policy, why would Defendant bother to exclude virus as it contends it did.

### A. Defendant Cannot Meet Its Burden of Establishing That an Exclusion Applies

When an insurer relies on an exclusion to deny coverage, the insurer has a "heavy burden" to show that the plaintiff's claims are "solely and entirely within the policy exclusions and, further, that the allegations, in toto, are subject to no other interpretation. *Vermont Mut. Ins. Co. v. Ciccone*, 900 F. Supp. 2d 249, 259 (D. Conn. 2012), *quoting Nationwide Mut. Ins. Co. v. McHugh*, 2001 WL 1706752, at *3 (Conn. Super. Ct. Dec. 19, 2001). *See also Liberty Mut. Ins. Co.*, 967 A.2d at 22 (ambiguous exclusions construed in favor of coverage); *R.T. Vanderbilt Co., Inc.*, 216 A.3d at 641 (same).

Here, Defendant cannot establish that Plaintiff's Business Income, Extra Expense, and Civil Authority claims are "solely and entirely within" the exclusion for fungi, wet rot, dry rot,

bacteria and virus, and cannot show that Plaintiff's allegations "*in toto*, are subject to no other interpretation" than to exclude coverage. Defendant has not shown that it is beyond reason that the list of common causes of wood disease that Defendant drafted into the exclusion for fungi, wet rot, dry rot, bacteria and virus signified anything more than an exclusion for losses due to wood disease, which can otherwise lead to insured losses when, *e.g.*, dry rot damages wood framing, or viruses kill trees that fall and crush the roofs of insured property. Nor has Defendant shown that it is beyond reason that Defendant would have included the 2006 ISO Endorsement into the policy if Defendant intended a broad virus exclusion pertaining to human health.

The cases that Defendant cites to in support of its argument that Plaintiff's allegations fall an under an exclusion in the Policy are distinguishable. Despite some of the cases that Defendant cites involving the same Limited Fungi, Bacteria, or Virus Coverage endorsement, none of the courts in their reasoning applied "*ejesdum generis*," as Plaintiff urges and only one plaintiff made a substantially similar canon of construction argument as Plaintiff[1]. The rest of the cases that Defendant cites in support of its position all either made dissimilar arguments and/or included policies that contained an express "virus" or "microorganism" exclusion.

**1. "Fungi", Wet Rot, Dry Rot, and Bacteria Denote Wood Disease, Thus, Under Connecticut Law, "Virus" Also Denotes Wood Disease**

The limited scope of the term "virus" in the exclusion for "Fungi", Wet Rot, Dry Rot, Bacteria and Virus is confirmed by the plain meaning of the terms of the exclusion.

"'Fungi' means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi." Exhibit A to Plaintiff's Original Complaint [Dkt. 1-1], at 128. Fungi is the plural of fungus, which is a kingdom of "spore-producing … organisms formerly classified as plants that lack chlorophyll and include molds,

[1] *See Pure Fitness LLC v. Twin City Fire Ins. Co.*, 2021 WL 512242 (N.D. Ala. Feb. 11, 2021).

rusts, mildews, smuts, mushrooms, and yeasts." *Fungus*, Merriam-Webster.com. A spore is a "reproductive body produced by plants, fungi, and some microorganisms and capable of development into a new individual either directly or after fusion with another spore." *Spore*, Merriam-Webster.com. A mycotoxin is "a toxic substance produced by a fungus and especially a mold." *Mycotoxin*, Merriam-Webster.com. Scent is "effluvia from a substance that affect the sense of smell." *Scent*, Merriam-Webster.com. Rotting wood smells. Wood rotted by fungi is wood disease.

Wet rot is "a soft rot," or "decay of timber by fungi that attack wood having high moisture content." *Wet rot*, Merriam-Webster.com. Dry rot is "a decay of seasoned timber caused by fungi" or "a fungal rot of plant tissue." *Dry rot*, Merriam-Webster.com.

Fungi, wet rot, and dry rot attack and harm wood. Viruses that attack humans are not in the same category as attackers of wood.

The canon of construction of "*ejusdem generis"* suggests that a general term that follows more specific terms should be read to embrace only objects similar in nature to those enumerated by the preceding specific words." *Mason Cap., Ltd. v. Kaman Corp.*, 2005 WL 2850083, at *14 (D. Conn. Oct. 31, 2005) (statutory construction). The Connecticut Supreme Court has embraced this canon of construction. "According to the rule of *ejusdem generis*, unless a contrary intent appears, where general terms are followed by specific terms in a statute, the general terms will be construed to embrace things of the same general kind or character as those specifically enumerated." *Cheshire Mortg. Serv., Inc. v. Montes*, 612 A.2d 1130, 1143 n. 31 (Conn. 1992). The facts and analysis from *Cheshire* are illustrative:

> The general term 'transaction fees' must be construed in light of the other, more specific, terms used in the statute. These other terms … are all specific prepaid interest charges. Consistent with the principle of ejusdem generis, therefore, the

> closing costs… which are not prepaid interest charges, should not be considered when determining whether a lender has exceeded the 10 percent limit.

*Id.*

The terms listed in the exclusion in the Virus Coverage attack wood. For example, the U.S. Forest Service has identified "pathogens such as fungi, bacteria, phytoplasmas, virus, viroids, and higher parasitic plants" that can serve as disease agents for trees, and that "under favorable environmental conditions and presence of a susceptive host … can do significant damage to forest resources nationwide."[2] "One good definition for tree disease is any harmful deviation, caused by a persistent agent, impacting the normal functions of the tree."[3] Defendant cannot extract "virus" from the wood and tree disease context and misapply it to the human disease and COVID-19 context. Damage by COVID-19 to surfaces made of wood and other materials is not wood disease, and the impairment and structural alteration alleged in the FAC is also not wood disease. Defendant's post hoc interpretive broadening of virus from wood disease to human disease misaligns virus with the terms that precede it in the exclusion, and therefore is an illogical interpretation that should be rejected. "Denying coverage for losses stemming from COVID-19, however, does not logically align with the grouping of the virus exclusion with other pollutants such that the Policy necessarily anticipated and intended to deny coverage for these kinds of business losses." *Urogynecology Specialist of Florida LLC*, 2020 WL 5939172 at * 4.

At best for Defendant, the Endorsement is ambiguous regarding COVID-19. But that is no help. Ambiguities must be construed in favor of the insured, *i.e.*, in favor of coverage. *Vermont Mut. Ins. Co.*, 900 F. Supp. 2d at 259; *Nationwide Mut. Ins. Co.*, 2001 WL 1706752, at *3; *Liberty Mut. Ins. Co.*, 967 A.2d at 22; *R.T. Vanderbilt Co., Inc.*, 216 A.3d at 641.

---

[2] Native Forest Insects and Diseases, available at https://www.fs.fed.us/foresthealth/protecting-forest/native-insects-diseases/index.shtml.

[3] *Id.*

**2. Defendant Forsook the 2006 ISO Endorsement, But Now Invokes the Broad Meaning of "Virus" From That Endorsement to Withhold Coverage**

Defendant drafted the Policy, and marked and sold the Policy to Plaintiff, without the 2006 ISO Endorsement for "Exclusion of Loss Due to Virus or Bacteria," which includes the following:

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease.
>
> However, this exclusion does not apply to loss or damage caused by or resulting from 'fungus', wet or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

Defendant forsook the industry's "Exclusion of Loss Due to Virus or Bacteria," and instead now wants to maintain that its "Limited Fungi, Bacteria or Virus Coverage" endorsement serves the same purpose. But, the narrow exclusion in that coverage endorsement excludes something entirely different—wood disease. The existence of the 2006 ISO Endorsement is evidence that, to exclude human viruses, insurers would not just tuck the term virus into a wood disease exclusion like the one in the Virus Coverage Endorsement. On these facts, Defendant cannot show that it is unreasonable for Plaintiff to believe that Defendant would have added the 2006 ISO Endorsement to the policy if Defendant intended to exclude human viruses such as COVID-19.

**3. Defendant Offers No Controlling Authority to Retroactively Expand the Exclusion for Fungi, Wet Rot, Dry Rot, Bacteria, and Virus to COVID-19**

Defendant asserts that the "Limited Fungi, Bacteria or Virus Coverage" endorsement's terms are unambiguous and bar coverage. *See* Motion at 11. However, the contradictions in the parties' interpretations make it clear that the language is "reasonably susceptible to more than one reading" and is thus ambiguous and should be construed liberally in favor of Plaintiff. *See Lexington Ins. Co. v. Lexington Healthcare Group*, 311 Conn. 29, 37-38 (2014).

If the terms of a policy are clear and unambiguous, those terms are given their natural and ordinary meaning. *See Connecticut Med. Ins. Co. v. Kulikowski*, 942 A.2d 334, 338 (Conn. 2008). However, applying the "natural or ordinary meaning" to exclusions only applies when the exclusion has a natural and ordinary meaning. Thus, for example, the policy analysis used by the court in *Heyman Assocs. No. 1. v. Ins. Co. of State of Pa.* did not begin with "natural and ordinary meaning," but instead began with determining whether the language of the policy is "clear and unambiguous" on the contested point. 653 A.2d 122, 131 (Conn. 1995). The court in *Heyman* set a standard for "clear and unambiguous language" that Defendant cannot meet in this case, which is that the policy define the key terms of the exclusion to include the cause of loss for which the insurer seeks to deny coverage. *Id.* (examining whether an "absolute pollution exclusion" clearly and unambiguously defined 'pollutant' to include fuel oil released into a waterway"). If the key terms of the exclusion are defined to include the cause of loss for which the insurer seeks to deny coverage, the language is given its "natural and ordinary meaning." *Id.* Otherwise, more analysis will be required to understand the intent of the parties.

Defendant does not meet the standard set forth in *Heyman*. Defendant defined "Fungi," but did not define "virus." Indeed, Defendant left "virus" undefined, despite defining many other words, including, for example: Fungi, Computer, Data, Finished Stock, Manager, Messenger, Money, Peripheral Device, Software, Suit, Theft, Business Income, and Extra Expense. Thus, Defendant did not define the key term for which Defendant now seeks to exclude coverage. Plaintiff reasonably understood that "virus" – as used in an exclusion which almost every other word refers to a wood disease – means a wood virus, not a human one. In its Motion, Defendant has noticeably continued to leave "virus," "dry rot," "wet rot," and "bacterium" undefined, other than to now make the convenient and unfounded assertion that the "novel coronavirus (SARS-

CoV-2) is a "virus" within the meaning of this exclusion." Motion at 1. Again, when all of these terms "plain meanings" are taken together, *ejusdem generis* makes it clear that the plain meaning of "virus" within the exclusion is meant to apply to a wood disease. Defendant cannot, after the fact, enforce a broader definition of "virus" to bring COVID-19 within the scope of the exclusion.

Defendant cites to only two cases that held the Limited Fungi, Bacteria or Virus Coverage endorsement precludes coverage for COVID-19 related losses in which the plaintiff made a similar wood or plant disease argument. *See* Motion at 11; *Pure Fitness LLC v. Twin City Fire Ins. Co.*, 2021 WL 512242, *4 (N.D. Ala. Feb. 11, 2021); *Robert E. Levy, D.M.D., LLC v. Hartford Fin. Servs. Grp. Inc.*, 2021 WL 598818, *5 (E.D. Mo. Feb. 16, 2021). However, neither court analyzed the exclusion under the *ejusdem generis* canon of instruction. The factual differences, legal arguments, and policy language in all of the various cases are distinctions with consequences. There is no clear weight of authority, and no controlling authority, that considers the facts and arguments in Plaintiff's case, and the Court would benefit from a full factual record before resolution of this case.

#### 4. If the "Virus" in the Policy is Construed to Include COVID-19, Plaintiff's Claims Are Covered by the Limited Fungi, Bacteria, or Virus Coverage

Even if virus is interpreted to have a broader meaning in the Endorsement than a form of wood disease, however, Defendant must still provide coverage to Plaintiff. The endorsement does not exclude coverage for loss due to virus altogether, it specifically provides thirty (30) days of "Time Element" – business interruption – coverage.

For reference, the Endorsement, with ellipses in place of text not necessary to understand the virus coverage, is as follows:[4]

[4] *See* Exhibit A to Plaintiff's Original Complaint [Dkt. 1-1], at 123.

This endorsement changes the Policy. Please read it carefully.

**LIMITED FUNGI, BACTERIA OR VIRUS COVERAGE**

This endorsement modifies insurance provided under the following:

Special Property Coverage Form …

A. Fungi, Bacteria or Virus Exclusions

1. Paragraph …

2. The following …

B. The following Additional Coverage is added to Paragraph A.4. … of the Special Property Coverage Form …:

1. Limited Coverage For "Fungi", Wet Rot, Dry Rot, Bacteria and Virus

a. The coverage described in 1.b. below only applies when the "fungi", wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

(1) A "specified cause of loss" other than fire or lightning;[5]
(2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises.

b. We will pay for loss or damage by "fungi", wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damage means:

(1) Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus;
(2) The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot, dry rot, bacteria or virus; and
(3) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot, dry rot, bacteria or virus are present.

c. Unless a higher Limit of Insurance …

[5] "'Specified Cause of Loss' means the following: Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." Exhibit A to Plaintiff's Original Complaint [Dkt. 1-1], at 52.

d. The coverage provided under this Limited Coverage …

e. The terms of this Limited Coverage …

f. The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.

(1) If the loss which resulted in "fungi", wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive. If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet or dry rot, bacteria or virus, but remediation of "fungi", wet or dry rot, bacteria or virus prolongs the "period of restoration", we will pay for loss and expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive.

C. Fungi Definition

1. "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

Form SS 40 93 07 05

---

The Endorsement provides "Additional Coverage" for the "Special Property Coverage Form," in which Defendant provided Time Element Coverages for Business Income, Extra Expense, and Civil Authority. See ¶ B. The Endorsement provides "Limited Coverage For 'Fungi, Wet Rot, Dry Rot, Bacteria and Virus." ¶ B.1. Defendant provided 30 days of coverage when Time Element Coverage applies to the insured premises.

> If the loss which resulted in 'fungi', wet or dry rot, bacteria or virus does not in itself necessitate a suspension of 'operations', but such suspension is necessary due to loss or damage to property caused by 'fungi', wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive.

¶ B.1.f.

The 2006 ISO Circular refers to business interruption losses as, “business interruption (time element) losses.” The Policy’s Declarations specify that the time period for the “Limited Fungi, Bacteria or Virus Coverage,” “including Business Income and Extra Expense coverage,” is “30 days.”[6] Therefore, the Time Element Coverages in the Endorsement refer to Business Income, Extra Expense, and/or Civil Authority coverages.

Defendant argues that the limited coverage applies only if the virus is the result of a specified cause of loss other than fire or lightning or an Equipment Breakdown Accident and Plaintiff experiences direct physical loss or direct damage to Covered Property caused by virus. Motion at 11. Defendant goes on to say that Plaintiff failed to allege any facts to satisfy the first element, that Plaintiff does not allege direct physical loss to its Covered Property (Motion at 12, 13-19), that Plaintiff is not entitled to standalone Time Element Coverage under subpart B.1.f. of the “Limited Coverage,” that “’[i]t is inappropriate to consider § B.1.f. in a vacuum separate and apart from the other provisions in the endorsement’ and subpart B.1.f. ‘does not provide for standalone coverage.’” Motion at 11-12. Defendant thereby seeks to limit the virus coverage in subpart B.1.f. to “those other provisions in the endorsement”, notably to the causes of loss listed in subpart B.1.a., which are (1) “A ‘specified cause of loss other than fire or lightning;” and (2) “Equipment Breakdown.” However, contrary to Defendant’s assertion, nothing about the text or structure of Subparts B.1.a through B.1.f suggest that Subpart B.1.f is governed by Subpart B.1.a. The text of Subpart B.1.a does not direct the reader to Subpart B.1.f. Moreover, nothing about Subpart B.1.f is unclear or incomplete without reference to B.1.a.

[6] Exhibit A to Plaintiff’s Original Complaint [Dkt. 1-1], at 11.

The Endorsement is clear that Additional Coverage is added to the Special Property Coverage Form. ¶ B. The Endorsement then adds Limited Coverage for Fungi, Wet Rot, Dry Rot, Bacteria and Virus. ¶ B.1. Nothing about that structure suggests that the coverage in Subpart B.1.f is limited to the causes of loss listed in Subpart B.1.a – and it is not.

Indeed, the opposite is the case. Defendant limited the coverage in Subpart B.1.b to the contributing causes listed in Subpart B.1.a: "The coverage described in 1.b. below only applies …" ¶ B.1.a. In contrast, Defendant included no words that limit the Time Element Coverage in Subpart B.1.f to the causes of loss listed in Subpart B.1.a. Instead, Subpart B.1.f. provides 30 days of coverage when a Time Element Coverage (*i.e.*, the Business Income and Extra Expense Coverages) applies to the insured property. ¶ B.1.f. As shown above, the Business Income, Extra Expense, and Civil Authority Time Element Coverages apply to Plaintiff's dental practice, which is the insured property.

At least one federal court in Texas denied a motion to dismiss a claim under Subpart B.1.f. *See* MTD at 14, citing *Independence Barbershop, LLC v. Twin City Fire Ins. Co.*, 2020 WL 6572428, at *4 (W.D. Tex. Nov. 4, 2020). In that case, Judge Nowlin specifically held that that the text of the policy does not limit the coverage in Subpart B.1.f to the contributing causes listed in Subpart B.1.a. *Id.* Plaintiff asks this Court to hold Defendant to the text of the policy in this case as well.

The 30 days of Time Element Coverage in Subpart B.1.f applies when: (A) "the loss" that causes a virus does not "in itself" require a suspension of operations, but (B) a suspension is required due to loss or damage to property caused by a virus. ¶ B.1.f.

As to (A), there was no loss that caused the virus. The virus was caused by natural transmission, not the leakage of medical waste, for example. Thus, (A) is inoperative in this

situation. As to (B), Plaintiff was required to suspend operations due to loss or damage to property caused by a virus – a point that Defendant does not contest. Therefore, Defendant obligated itself to pay Time Element Coverages for Business Income, Extra Expense, and Civil Authority for loss and expense for 30 days.

Defendant can avoid virus coverage only if Defendant acknowledges that Fungi, Wet Rot, Dry Rot, Bacteria and Virus refer to wood disease, but Defendant has clung to a contrary view. Thus, if the "virus" in the Policy is construed to include COVID-19, Plaintiff's claims are covered under the "Limited Fungi, Bacteria or Virus Coverage."

**B. Plaintiff Has Sufficiently Alleged Direct Physical Loss of or Physical Damage to Property**

Plaintiff has stated a plausible claim under the Business Income and Extra Expense provisions of the Policy because Plaintiff has sufficiently alleged "direct physical loss of or physical damage to" Plaintiff's Covered Property. FAC at ¶¶ 12, 13-18, 56-60, 62-65, 68-79. Despite Defendant's mischaracterization that Plaintiff has only pled "pure economic losses" as a result of the Closure Orders and that "[e]conomic losses in the absence of physical alteration to property are not covered" (Motion at 14), Plaintiff has adequately pled direct physical loss to property and although it is not required, physical alteration of its property as well. To the extent that this Court finds that direct physical loss or damage implies that "there was an initial satisfactory state that was changed into an unsatisfactory state," Plaintiff has expressly pleaded the same. *England v. Amica Mut. Ins. Co.*, 2017 WL 3996394, *8 (D. Conn. 2017); *See* FAC at ¶ 72 (The physical losses to Plaintiff's property include without limitation the rendering of insured property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of the coronavirus, fomites, and respiratory droplets or nuclei directly upon the property); *see also* FAC ¶¶ 12-17, 47, 65-79.

Defendant's contention that "direct physical loss" requires a physical or tangible change to property to trigger Business Income coverage under the Policy is incorrect. Motion at 14-17. *See Brown's Gym, Inc. v. The Cincinnati Ins. Co.*, 2021 WL 2953039, *20 (Pa.Com.Pl. Jul 13, 2021) (holding that "[u]nder the 'reasonable and realistic standard for identifying physical loss or damage' established in *Port Authority*[7] and *Hardinger*[8] for cases 'where sources unnoticeable to the naked eye' substantially reduce the use of property, an insured may satisfy the 'direct physical loss or damage' prerequisite for coverage if the invisible agent renders the property 'useless or uninhabitable,' or the property's functionality is 'nearly eliminated or destroyed' by that source"); *Newman Myers Kreines Gross Harris, P.C. v. Great American Northern Ins. Co.*, 17 F.Supp. 3d 323, 330 (S.D.N.Y. 2014) (holding that a policy that "require[es] 'physical loss or damage', does not require that the physical loss or damage be tangible, structural, or even visible."); *Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009). Many courts have found that "direct physical loss" reasonably includes loss of use or functionality of covered property. *See, e.g., Ungarean, DMD v. CAN*, 2021 WL 1164836, *8 (Pa. Ct. Com. Pl. Mar. 25, 2021) (finding "reasonable" plaintiff's interpretation of direct physical loss that "encompass[es] the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property"); *Williams PLLC v. Cincinnati Ins. Co.*, 2021 WL 767617 (N.D. Ill. Feb. 28, 2021) ("[T]he term 'physical loss' is broad enough to cover … a deprivation of the use of [policyholder's] business premises."); *Salon XL Color & Design Grp., LLC v. W. Bend Mut. Ins. Co.*, 2021 WL 391418, *2 (E.D. Mi. Feb. 4, 2021) (holding plaintiffs "plausibly alleged that the COVID-19 particles have infected their property, exposed their staff and patrons, and therefore Salon XL 'has been unable to use its property for its intended purpose,'" which satisfied direct-physical-loss requirements at

[7] *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002).
[8] *Motorists Mutual Ins. Co. v. Hardinger*, 131 Fed.Appx. 823 (3d Cir. 2005).

the pleading stage); *Henderson Road Rest. Sys. v. Zurich Am. Ins. Co.*, 2021 WL 168422, *12–13 (N.D. Ohio Jan. 19, 2021) (finding "Plaintiffs have shown that their business operations were suspended by direct physical loss of or damage to property at the premises" where "Plaintiffs closed their premises on various dates in response to" closure orders); *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 2020 WL 7249624, *10 (E.D. Va. Dec.9, 2020) ("[W]hile the [insured property] was not structurally damaged, it is plausible that Plaintiff experienced a direct physical loss when the property was deemed uninhabitable, inaccessible, and dangerous to use by the Executive Orders…."); *Perry Street Brewing Co., LLC v. Mut. Of Enumclaw Ins. Co.*, 2020 WL 7258116, *3 (Wash. Super. Ct. Nov. 23, 2020) (concluding insured suffered a direct physical loss because their covered property "could not physically be used for its intended purpose, i.e., [the insured] suffered a loss of its property because it was deprived from using it"); *North State Deli, LLC v. Cincinnati Ins. Co.*, 2020 WL 6281507, *3-4 (N.C. Super. Ct. Durham Cty. Oct 9, 2020) ("Applying [dictionary] definitions reveals that the ordinary meaning of the phrase 'direct physical loss' includes the inability to utilize of possess something in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions," and concluding that closure orders prohibiting access to non-essential businesses constituted "direct physical loss.").

The court overseeing the first of two multidistrict COVID-19 business interruption litigations recently emphasized that a plaintiff alleging a loss of functional space or functionality of property has, in fact, alleged a direct physical loss – and not merely economic impact – because of the physical limit imposed by the Closure Orders.

> [V]iewed in the light most favorable to the Plaintiffs, the pandemic-caused shutdown orders do impose a *physical* limit: the restaurants are limited from using much of their physical space. It is not as if the shutdown the orders imposed a *financial* limit on the restaurants by, for example, capping the dollar-amount of

> daily sales that each restaurant could make. No, instead the Plaintiffs cannot use (or cannot fully use) the physical space. *Id.*

*In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.* ("*Society*"), 2021 WL 679109, *9 (N.D. Ill. Feb. 22, 2021) (further noting that with proximate cause as the governing standard a reasonable jury could find that the coronavirus and resulting pandemic proximately caused the business interruptions because even if the closure orders played a causal role in the plaintiff's losses, and even if those orders cannot be construed as "direct physical loss," the orders were proximately caused by the pandemic); *see also Hajer v. Ohio Security Ins. Co.*, 2020 WL 7211636, *4 (E.D. Texas (2020) (holding that the "COVID-19 pandemic fits neatly 'in the chain of causation'" and that "[e]ven if plaintiff were to allege that the stay-at-home orders, not the pandemic, are the cause of its loss in profits, the ongoing virus pandemic directly prompted those stay-at-home orders."). The same is true here, and Plaintiffs plausibly state a claim for which relief can be granted.

This interpretation is consistent with the meaning long given to the key term in decisions outside of the COVID-19 business interruption context, in which courts routinely held that properties sustain "direct physical loss or damage" when they lost habitability or functionality, including commercial functionality. For example, in *Murray v. State Farm Fire & Casualty Co.*, 509 S.E.2d 1 (W. Va. 1998), the policyholder sought coverage for "direct physical loss to the property" when the policyholder's home was rendered uninhabitable by the threat of falling rocks. The court rejected the insurance companies' argument that structural alteration was required:

> The policies in question provide coverage against "sudden and accidental loss" and "accidental direct physical loss" to property. "'Direct physical loss' provisions require only that a covered property be injured, not destroyed. *Direct physical loss also may exist in the absence of structural damage to the insured property.*"
>
> * * *
>
> We therefore hold that an insurance policy provision providing coverage for a "sudden and accidental" loss or an "accidental direct physical loss" to insured

> property requires only that the property be damages, not destroyed. *Losses covered by the policy, including those rendering the insured property unusable or uninhabitable, may exist in the absence of structural damage to the insured property.*

*Id.* at 17 (quoting *Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 200 (Minn. App. Ct. 1997));[9] *see also Brown's Gym, Inc.*, 2021 WL 2953039, at *20 (pointing out that in pre-COVID-19 case law, "the requisite 'physical loss or damage' was established when vapors, odors, fumes, and other contaminants from ammonia, carbon-monoxide, arsenic, salmonella, lead, and other non-visual sources made property uninhabitable or unusable, or nearly destroyed or eliminated its functionality"); *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x. 823, 825–27 (3d Cir. 2005) (finding contamination of a home's water supply that rendered the home uninhabitable constitutes "direct physical loss"); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010) (finding "direct physical loss" where home was "rendered uninhabitable by the toxic gases" released by defective drywall), *aff'd*, 504 F. App'x. 251 (4th Cir. 2013); *Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Conn.*, 2007 WL 464715, *8 (D. Or. 2007) (holding that industrial furnace sustained "direct physical loss or damage" when lead contamination prevented it from being used for intended commercial purpose); *Gen. Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (holding that a direct physical loss had occurred when an insured's property—cereal oats—was infested by an unapproved pesticide because "function [was] seriously impaired"); *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 806 N.Y.S.2d 709, 711 (N.Y. App. Div. 2005) (rejecting argument that "demonstrable alteration" was required, holding instead that coverage is triggered when the "*function and value [of the property] have been seriously impaired*"). "Thus, in instances where the insured avers that the COVID-19 virus was present on the insured premises and caused the covered property to

---

[9] Emphasis is added unless otherwise indicated.

become uninhabitable or unusable, or nearly eliminated or destroyed its functionality," an insured has sufficiently alleged physical loss or damage as such "'loss or harm'" to property "'stem[s] immediately from a [coronavirus] source,'" and is perceptible "'through the senses and subject to the laws of nature.'" *Brown's Gym, Inc.*, 2021 WL 2953039, at *20 *citing Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020), *cert denied sub nom., Republican Party of Pennsylvania v. Degraffenreid*, 141 S.Ct. 732 (U.S. 2021) (holding that because the plaintiff sufficiently pled the presence of COVID-19 at its property rendered its property unusable, unsafe, unduly dangerous to use, and unfit for its intended use, the plaintiff adequately alleged physical loss or damage for purposes of business income, extra expense, and civil authority coverage). Accordingly, because Plaintiff has pled the presence of COVID-19 at its property and that Plaintiff's property was rendered unduly dangerous and unusable for its intended use, Plaintiff has adequately alleged physical damage and loss. *see* FAC ¶¶ 10-18, 57-60, 62-65, 69-78.

Further, Defendant provides little to no text-based analysis in support of its preferred construction of "direct physical loss of or physical damage," instead, pointing to a string of cases Defendant contends requires dismissal. This is improper. *Henderson Road*, 2021 WL 168422 at *12; *see also Fayette Cty. Housing Auth. v. Housing & Redev. Ins. Exch.*, 771 A.2d 11, 15 (Pa. Super. 2001) (stating it "would amount to abdicating our judicial role were we to decide such cases by the purely mechanical process of searching the nations courts to ascertain if there are conflicting decisions"). Review of the plain and ordinary meaning of "direct physical loss or damage," as required, shows that structural alteration of property is not required and that Plaintiffs' construction is reasonable. Dismissal is therefore inappropriate. See, *e.g.*, *Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F.Supp.3d 394 (D. Conn. 2017) *quoting Karas v. Liberty Ins. Corp.*, 33 F.Supp.3d 110, 115 (D. Conn. 2014); *EDO Corp. v. Newark Ins. Co.*, 878 F.Supp. 366, 372 (D. Conn. 1995) (providing

that any reasonable interpretation of the policy resulting in coverage of the insured must be adopted and where each party has a reasonable but different interpretation of the phrases supported by dictionaries and case law, the phrase(s) is ambiguous and must be construed against the insurer).

The terms "direct," "physical," "loss," and "damage" go undefined in the Policy's relevant forms. Accordingly, consideration of their dictionary definitions is appropriate. *See, e.g.*, *Henderson Road*, 2021 WL 168422 at *13. *Nothing* about the plain and ordinary meaning of these words on their own or when strung together requires structural alteration. "Direct" is often defined as "characterized by close logical, causal, or consequential relationship;" "marked by absence of an intervening agency, instrumentality, or influence;" or "proceeding from one point to another in time or space without deviation or interruption."[10] COVID-19's presence and Closure Orders, as opposed to a separate "intervening force," are the alleged source of Plaintiffs' losses. *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015).

Pertinent definitions of "physical" describe something "having material existence" or "perceptible especially through the senses." Merriam-Webster. This does not require structural alteration. An event or condition that prevents persons from inhabiting or operating a room in their home or business is no less "physical" of a loss under these definitions than an event that destroys that room. Defendant confuses "physical" with "structural." But those terms are not interchangeable. *See Wakefern Food Corp. v. Liberty Mutual Fir Ins. Co.*, 968 A.2d 724, 735 (NJ. App. Div. 2009) ("Since 'physical' can mean more than material alteration or damage, it was incumbent on the insurer to clearly and specifically rule out coverage in the circumstances where it was not to be provided, something that did not occur here.").

Neither "loss" nor "damage" necessarily requires structural alteration under their plain and

[10] Direct, Merriam-Webster, https://www.merriam-webster.com/ (last visited July 19, 2021).

ordinary meanings. Definitions of "loss" include not only "destruction" and "ruin," but also "the act of losing possession: deprivation" and "failure to… utilize." Merriam-Webster; *see also* Thesaurus.com, Loss, https://www.thesaurus.com/browse/loss (including "deprivation," "dispossession," and "impairment" as synonyms for "loss"). Similarly, "damage" means more than tangible injury. *See* Merriam-Webster (defining "damage" to include expense and cost); Thesaurus.com (listing "contamination," "impairment," "deprivation," and "detriment" as synonyms for "damage"); *see also Dundee Mut. Ins. Co. v. Marifjeren*, 587 N.W.2d 191, 194 (N.D. 1998) ("Clearly, without qualification, the term 'damage' encompasses more than physical or tangible damage." (quoting *Black's Law Dictionary* 389 (6th ed. 1990))).

Even if "damage" were to unambiguously require structural alteration, that would only drive home the fact that "direct physical loss of ***or*** damage," when read as a whole, does not require structural alteration because of the phrase's disjunctive "or." *See, e.g.*, *Ungarean*, 2021 WL 1164836 at *6; *Williams*, 2021 WL 767617 at *4; *Henderson Road*, 2021 WL 168422 at *10; *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 801 (W.D. Mo. 2020). "It would be one thing if coverage were limited to direct physical 'damage,'" but Defendant chose to "extend[] [coverage] to direct physical 'loss'" to property as well. *Society*, 2021 WL 679109 at *8. Adopting Defendant's construction would render policy language superfluous, contrary to traditional canons of insurance policy construction. *See, e.g.*, *Affiliated FM Ins. Co. v. Owens-Corning Fiberglass Corp.*, 16 F.3d 684, 686 (6th Cir. 1994).

Indeed, as discussed, courts evaluating COVID-19 business interruption insurance claims nationwide have held that under the plain and ordinary meaning of the phrase, "direct physical loss or damage" covers the circumstances alleged here, where Plaintiffs lost the use, functionality, and habitability of covered property, even absent physical damage to property. *See, e.g.*, *N. State Deli*,

*LLC v. Cincinnati Ins. Co.*, 2020 WL 6281507, *3 (N.C. Super. Ct. Oct. 9, 2020). Had Defendant intended to provide Business Income coverage only where covered property was structurally altered, it could have done so expressly. Indeed, Defendant has specifically defined related terms in other forms included in Plaintiff's Policy. *See, e.g.*, Policy at 76 (defining "property damage" in Business Liability Coverage Form to include "physical injury to tangible property"). The Court cannot now supply terms Defendant omitted when drafting the Policies.

Defendant also mistakenly relies on the Policy's "period of restoration" provisions ("POR") to advance its structural alteration interpretation. The POR states that business interruption insurance coverage begins at the time of direct physical loss or physical damage and ends at the earlier of the date when covered property should be "repaired, rebuilt or replaced," or when the business is "resumed at a new, permanent location." *E.g.*, Policy at 50-51. Contrary to Defendant's argument, nothing in the POR requires structural alteration. Indeed, "[t]here is nothing inherent in the meanings of those words that would be inconsistent with characterizing the Plaintiffs' loss of their space due to the shutdown orders," or coronavirus contamination, "as a physical loss." *Society*, 2021 WL 679109 at *9. Rather, the POR "describes a time period during which loss of business income will be covered, rather than an explicit definition of coverage." *Id.* The clear purpose of the POR is to require that any repair, rebuilding, or replacement of covered property be performed "with reasonable speed and similar quality" to prevent slow workmanship or intentional delay from increasing an insurer's payment of lost business income. Policy at 50. Furthermore, because the POR can end on the date "when the business is resumed at a new permanent location," the Policies contemplate that covered physical loss or damage to property may not necessitate repair, rebuilding, or replacement.

As applied to the circumstances alleged here, the Policy's POR ends when Plaintiff's

Covered Property is "repaired" or "rebuilt" in a manner that allows them to safely reopen within the confines of local restrictions, such as installing COVID-19 protocols; affixing hand sanitizer stations to the walls; and stringently cleaning headrests, which destroyed the headrests. *See* FAC ¶¶ 74-77; *see also Society*, 2021 WL 679109 at *9 ("If, for example, the coronavirus risk could be minimized by the installation of partitions and a particular ventilation system, then the restaurants would be expected to "repair" the space by installing those safety features"); *Brown's Gym, Inc.*, 2021 WL 2953039, at *22 *citing Legacy Sports Barbershop*, 2021 WL 2206161, *3 (reasoning that the "period of restoration" provision was satisfied by the plaintiff's "repairs and remedial measures in the form of 'the installation of partitions' and 'handwashing/sanitation stations' and other actions undertaken to renovate the premises in order to make the property safe for public use").Thus, the POR contemplates a meaning of "direct physical loss or damage" that encompasses the loss of function of covered property in the absence of structural alteration. No reasonable policyholder would expect for the POR, which establishes the quantifiable duration of coverage, to introduce an additional requirement, absent from the provisions defining coverage, that Covered Property must be structurally altered.

Even if the Court adopts Defendant's construction of "direct physical loss or damage," Plaintiffs' allegations of the presence and contamination of COVID-19 at Covered Property satisfies their restrictive definition. Plaintiff alleges structural alteration of the ambient air and surfaces of Covered Property by COVID-19. FAC ¶¶ 65-74. Despite Defendant's characterization as "bald assertions", these are not conclusory allegations; Plaintiff has alleged that, at the time of filing, "[i]ndividuals with COVID-19 or otherwise carrying the coronavirus have been physical present at Plaintiff's practice," *id.* ¶ 65, and the presence of the disease altered the structure of the air, the physical space, and the surfaces of Covered Property, *id.* ¶¶ 68, 75, 77. Plaintiffs also allege

COVID-19 has denied them use of their properties, requiring physical repair and causing necessary business suspensions, *id.* ¶¶ 74-79; that the functional space of Covered Property was unusable for several months and is now functional only in a severely diminished capacity, *id.* ¶¶ 74-79; and that and that events were cancelled, business operations were severely impacted, and numerous repairs and refurbishments were required to make Insured Premises safe for human occupation, *id.* ¶¶ 74-79. *See Legacy Sports Barbershop, LLC v. Continental Cas. Co.*, 2021 WL 2206161, *3 (N.D.Ill. 2021) (reasoning that the insured "sufficiently alleged that the [P]roperties underwent a 'distinct, demonstrable, physical alteration' and therefore suffered 'physical loss of or damage to' the [P]roperties" … "as a result of COVID-19" and the resulting physical alterations made to the properties to "promote proper social distancing.") Plaintiff has sufficiently alleged similar physical alterations made to Covered Property as a result of the presence of COVID-19. *See* FAC ¶¶ 74-77. In addition, Plaintiff will offer expert testimony to show how COVID-19 spreads and has infested its property. *See id.* ¶ 11. Thus, even under Defendant's restrictive interpretation, Plaintiff states a claim for relief.

Many courts have held that allegations of the presence of COVID-19 sufficiently demonstrate a direct physical loss. *See, e.g.*, (*Goodwill Indu. Of Orange Cnty. Cal. v. Phila. Indem. Ins. Co.*, 2021 WL 476268, *3 (Super. Ct. Cal. Orange Cty. Jan. 28, 2021); *cf. Michael Cetta, Inc. v. Admiral Indem. Co.*, 2020 WL 7321405, at *10 (S.D.N.Y. Dec. 11, 2020) (finding no direct physical loss, construed to require structural alteration, where plaintiff "makes clear that COVID-19 was never found on its premises and that it has no reason to think the virus contaminated or damaged anything at the restaurant"); *Atwells Realty Corp. v. Scottsdale Ins. Co.*, 2021 WL 2396584, *6 (R.I.Super June 4, 2021) (finding that the plaintiff failed to plead facts showing physical damage or loss by failing to allege that any individual contracted COVID-19 or that the

property was contaminated by COVID-19). Here, Plaintiff expressly alleges that "the Covered Property has been infiltrated and contaminated by COVID-19" and that "the virus was there." FAC ¶ 10. In addition, courts around the country have held that infestation of covered property by microscopic entities that are harmful to human health constitutes direct physical loss or damage. *See, e.g.*, *Netherlands Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 916–17 (8th Cir. 2014) (salmonella); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 6675934, *6 (D.N.J. Nov. 25, 2014) (ammonia gas); *Stack Metallurgical Servs.*, 2007 WL 464715 at *8 (lead); *U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 931 (Ill. 1991) (asbestos).

Defendant impermissibly asks this Court to resolve multiple factual disputes regarding the veracity of Plaintiff's allegations. Whether Plaintiff can actually establish the alleged facts at trial is irrelevant at the motion to dismiss stage. *See Gibson v. Scap*, 960 F.Supp.2d 373, 377 (D. Conn. 2013) *citing Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d. Cir. 2009) (explaining that "the role of a district court in considering such a motion 'is not to resolve disputed questions of fact' and 'the trial court must resolve all ambiguities and draw all inferences in favor of the'" plaintiff); *see also NECO, Inc. d/b/a Play It Again Sports v. Owners Ins. Co.*, 2021 WL 601501, *5 (W.D. Mo. Feb. 16, 2021) ("Plaintiff does not need to prove [its case] at this stage of the litigation.").

Plaintiff has pleaded that COVID-19 has attached and adhered to Covered Property's surfaces and ambient air in a manner that causes loss and damage by physically altering the same and by rendering the affected premises affirmatively dangerous to human health. *E.g.*, FAC ¶¶ 65-68; *see also id.* ¶¶ 40–52 (alleging, with references to scientific literature, how coronavirus spreads and affects ambient air and physical spaces and surfaces). Defendant's characterization of these comprehensive allegations as "bald assertions" and "pure speculation" is wrong. MTD 17. The

FAC clearly "tenders more than mere naked assertions devoid of further factual enhancement." *Play It Again Sports*, 2021 WL 601501 at *5 (denying motion to dismiss).

Moreover, Defendant's contention that COVID-19 does not cause damage because it can be eliminated by cleaning inappropriately asks this Court to resolve a factual dispute in favor of Defendants. But that belief is contradicted by the facts alleged in the FAC and significant scientific evidence, making structural alteration a quintessential jury issue. *See, e.g.*, FAC ¶¶ 40-52; *see also id.* ¶¶ 61-79 (alleging facts showing physical alteration or structural degradation of covered property that necessitated extensive repairs beyond wiping down surfaces to reduce harm from COVID-19).[11] These allegations must be taken as true and construed in favor of *Plaintiffs*. There is substantial support for Plaintiff's position in the scientific literature. The World Health Organization expressly recognizes that COVID-19 transforms everyday surfaces into fomites, making them transmission vehicles for disease.[12] Studies have demonstrated that COVID-19 is "much more resilient to cleaning than other respiratory viruses tested."[13] A decontaminant may or may not be efficacious depending on the type of decontaminant and the contact time of the decontaminant on the property surface.[14] And, the interaction of the decontaminant with the virus

[11] Although not appropriate for the Court's consideration at this stage, Plaintiff notes that its allegations are supported by extensive scientific evidence while Defendant's assertions of decontamination are subject to scrutiny—or at least raise a genuine dispute for the factfinder. *See, e.g.*, Nevio Cimolai, *Environmental and Decontamination Issues for Human Coronaviruses and Their Potential Surrogates*, 92 J. of Med. Virology 11, 2498-510 (June 21, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (explaining that COVID-19 is "much more resilient to cleaning than other respiratory viruses tested," how decontaminant's effectiveness depends on its type and contact time on the property surface, and that the interaction of a decontaminant with the virus may make it difficult to test whether the decontaminant has actually eliminated the virus).

[12] World Health Organization, *Transmission of SARS-CoV-2: Implications for Infection Prevention Precautions* (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions.

[13] Nevio Cimolai, *Environmental and Decontamination Issues for Human Coronaviruses and Their Potential Surrogates,* 92 J. of Med. Virology 11, 2498–510 (June 21, 2020), https://doi.org/10.1002/jmv.26170.

[14] *Id.*

may make it difficult to test whether the decontaminant has actually eliminated the virus.[15] Indeed, the United States District Court for the District of Minnesota has recognized that "there may not yet be a perfect solution in preventing the spread of this infectious disease" and that even in connection with other preventative measures, frequent sanitization is not enough to guarantee that COVID-19 will not enter or spread within a facility.[16]

Finally, to the extent there is any doubt about the proper construction of "direct physical loss or damage," the Court should conclude it is susceptible to more than one reasonable interpretation. In such circumstances, and at this stage of the litigation, the provision should be construed in favor of Plaintiff and a finding of coverage. *See, e.g.*, *Henderson Road*, 2021 WL 168422 at *12. At the very least, where policy language is ambiguous, Plaintiff should be permitted to develop extrinsic evidence in support of their interpretation of this critical policy phrase. *See, Fiallo v. Allstate Ins. Co.*, 138 Conn.App 325, 341-42 (2012) (providing that if a policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation). Indeed, Plaintiff has alleged extrinsic evidence that will show Plaintiff suffered direct physical loss or damage. *See* FAC ¶ 30. Plaintiff is entitled to have the Court consider extrinsic evidence in support of their interpretations of key policy provisions and must therefore be given an opportunity to develop such evidence through discovery regarding, for example, expert testimony, Defendant's policy-drafting history, its understanding of critical policy provisions, and the creation and inclusion of a virus exclusion in other Hartford Casualty Insurance Company policies.

**C. Plaintiff is Entitled to Civil Authority Coverage**

Plaintiff has plausibly alleged the requisite physical loss or damage to trigger Civil Authority coverage, including express allegations the presence of coronavirus at two medical

---

[15] *Id.*

[16] *Mohammed v. Tritten*, 2020 WL 2750836, *24 (D. Minn. 2020).

institutions nearby the Covered Property. *See S. Dental Birmingham LLC v. Cincinnati Ins. Co.*, 2021 WL 1217327, at *6 (N.D. Ala. Mar. 19, 2021) (rejecting Cincinnati's argument that coronavirus "is not causing direct physical loss to other property" based on plaintiff's sufficient allegations of physical loss or damage to its own premises, and because plaintiff "pleaded that property other than its Property was damaged"). Plaintiffs' express allegations of the presence of COVID-19 at properties within miles of the Covered Property along with explaining how such viral presence causes property damage is sufficient to allege that the identified nearby properties have suffered physical damage and/or loss as a result of COVID-19's presence. *See* FAC 47-55, (allegations of damage), ¶¶ 62-64 (allegations of other property). Unlike the cases Defendant cites where the plaintiffs failed to allege damage to other properties nearby the Covered Property, Plaintiff here expressly does so and Defendant fails to explain how these allegations, which must be taken as true, are insufficient. *See Santo's Italian Café LLC v Acuity Ins. Co.*, 2020 WL 7490095 (N.D. Ohio 2020) (holding that to make a threshold claim for Civil Authority coverage, a plaintiff must allege that another property other that its own sustained direct physical loss and that the plaintiff made no such allegation); FAC ¶¶ 62-64; *see also Sloan v. Phoenix of Hartford Ins. Co.*, 207 N.W.2d 434, 437 (Mich. 1973)[17] (illustrating that non-structural damage is sufficient to trigger coverage based on actions of civil authorities); *Allen Park Theatre Co. v. Michigan Millers Mut. Ins. Co.*, 210 N.W.2d 402, 403 (Mich. Ct. App. 1973) ("If the insurer wanted to be sure that the payment of business interruption benefits had to be accompanied by physical damage it was its burden to say so unequivocally.").

[17] "Here one of the perils insured against was riot. A riot ensued, the governor imposed a curfew, and all places of amusement were closed, thus preventing access to plaintiffs' place of business…[P]hysical damage to the premises was not a prerequisite for the payment of benefits under the business-interruption policy."

In addition, Plaintiff has plausibly alleged Closure Orders prohibited access to these nearby properties as well as to Covered Property under the Policy, and Defendant's arguments to the contrary must fail. *See* FAC ¶¶ 62-65, 78. Further, Plaintiff has alleged that on March 17, 2020, the State of Ohio issued a civil authority order that required the cancellation of non-essential or elective surgeries and that on March 22, 2020, the State of Ohio issued a civil authority order that requiring the closure of non-essential businesses. FAC ¶¶ 57-60. Defendant argues that this provision requires a civil authority to completely prohibit or prevent an insured from accessing their premises altogether for Civil Authority coverage to be triggered, Motion at 21. Not only is this contention inappropriate for consideration on a motion to dismiss and better suited for resolution once discovery has taken place at a later stage in the litigation[18], but Defendant's construction stretches the Policy's plain language too far, and it offers no plain-language analysis that it is the *only* reasonable interpretation of the phrase as a layperson would understand it. *See, e.g., Ungarean*, 2021 WL 1164836 at *10 ("The contract merely requires that 'an action of civil authority … prohibits access to' Plaintiff's property. It does not clearly and unambiguously state that any such prohibition must completely and totally bar all persons from any form of access to Plaintiff's property whatsoever.").[19] Further, the pretextual "requirement" of *complete*

---

[18] *Blue Spring Dental Care, LLC*, 2020 WL 5637963, at *8.

[19] *See also Studio 417*, 2020 WL 4692385, at *7 (explaining that at the motion to dismiss stage, these allegations plausibly allege that access was prohibited to such a degree as to trigger the civil authority coverage…This is particularly true insofar as the Policies require that the "civil authority prohibits access," but does not specify "all access" or "any access" to the premises."); *Blue Springs*, 2020 WL 5637963, at *8 (denying motion to dismiss civil authority coverage where dental clinics closed three locations but left a fourth open for emergency dental services, where "the insurance policy did not specify that 'all access' or 'any access' to the insured property had to be prohibited."); *McKinley Development Leasing Company Ltd*., *et al v. Westfield Ins. Co.*, 2020 WL 7265230, at 8 (Ohio Com.Pl. Oct. 21, 2020) (holding that at the motion to dismiss stage, plaintiff's allegations plausibly alleged that access was prohibited to such a degree as to trigger Civil Authority Coverage which similarly did not specify "all access" or "any access"); *Brown's Gym, Inc*,, 2021 WL 2953039, at *23 (holding that taking the plaintiff's allegations as true, the plaintiff alleged a viable claim for civil authority coverage because public access to the plaintiff's premises was prohibited and the plaintiff "was denied access to its premises due to closure orders stemming from the coronavirus on nearby properties).

prohibition—which is *not* in the Policy—is belied by the fact that the Policy specifically provides coverage for "suspension of [Plaintiff's] 'operations.'" Policy, at 36.

The Closure Orders alleged here forbid customers and employees alike from either using the Covered Property for their intended purposes or from entering the Covered Property altogether FAC ¶¶ 10, 12-13, 16-18, 74. The Closure Orders required the complete closure of non-essential business, and cancelled non-essential or elective surgeries. FAC ¶¶ 57-60. Where businesses' premises are ordered to close to the public and ordinary operations are banned, customers and employees alike are "prohibit[ed]" from "accessing" Covered Property. This construction reasonably applies the ordinary meaning of the undefined phrase's component words. *See e.g.*, Merriam-Webster (defining "prohibit" as "to forbid by authority," "to prevent from doing something," and "preclude;" and defining "access" as "permission, liberty, or ability to enter, approach, or pass to and from a place," "freedom or ability to obtain or make use of something," and "a way or means of entering or approaching").

Defendant's reliance on the "Minimum Basic Operations" business-preservation permissions within some Closure Orders does not alter Plaintiff's entitlement to Civil Authority coverage. Nothing in the Civil Authority provision suggests that every single individual must be explicitly and physically unable to enter the premises of a closed business to trigger coverage. And Defendant has not explained how a business owner purchasing business interruption insurance would have intended for this provision to preclude coverage when, as here, the government forbids its businesses from opening, its employees from coming to work, and its customers from entering the premises simply because the owner could continue "Minimum Basic Operations," and is physically able to access the building to, for example, check the mail, maintain inventory, or process employee payroll. MTD at 20-21. As the drafter of this boilerplate adhesive contract,

Defendant could have specified the contours of the prohibited access required for Civil Authority coverage. This Court cannot now read into the Policy what Defendant omitted.

Plaintiff's construction is supported by other COVID-19 business insurance decisions. *See, e.g.*, *Blue Springs Dental Care, LLC. Owners Ins. Co.*, 488 F. Supp. 3d 867, 879 (W.D. Mo. 2020) (finding allegations that closure orders permitted only emergency dental services sufficient to trigger coverage, and noting "the insurance policy did not specify that 'all access' or 'any access' to the insured property had to be prohibited"); *Studio 417*, 478 F. Supp. 3d at 803–04 (finding prohibition of access sufficient where "inside seating is prohibited in restaurants"); *Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*, 2020 WL 7258114, at * (Ohio Ct. Com. Pl. Nov. 17, 2020) (denying motion to dismiss where "the policy here does not specify that *all* access to the premises be absolutely prohibited").[20]

Despite Defendant's contention that civil authority orders were issued solely to prevent the future spread of COVID-19 to people (MTD at 21-22), civil authority orders across the country were also issued in response to the physical loss and property damage the spread and presence of COVID-19 causes and how it transforms a property to one that is affirmatively dangerous and potentially deadly for humans. *See* FAC ¶ 54-56. When issuing stay at home orders, numerous civil authorities "specifically found that COVID-19 causes property damage." *See* FAC ¶ 38. Further, and as discussed supra, the court in *Society* held that even if the closure orders cannot be

---

[20] Plaintiff's construction is also supported by non-COVID-19 business interruption cases. *See, e.g.*, *Altru HealthSys. v. Am. Prot. Ins. Co.*, 238 F.3d 961, 963 (8th Cir. 2001) (access prohibited where state health department order did not permit hospital to have patients inside facility and hospitals remained closed for 3 weeks); *Abner, Herrman & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331, 336-37 (S.D.N.Y. 2004) (civil authority coverage applied to four days after September 11, 2001 where employees and customers could not enter premises); *Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. CIV.A.01-5679, 2002 WL 31247972, at *1, 4 (E.D. Pa. Sept. 30, 2002) (finding civil authority coverage where order prohibited business operations on insured premises but permitted access to emergency personnel); *cf. 54th Street Ltd. Partners, L.P. v. Fidelity & Guar. Ins. Co.*, 306 A.D.2d 67, 67 (N.Y. App. Div. 2003) (finding no civil authority coverage during time period that "restaurant was accessible to *the public, plaintiff's employees and its vendors*").

construed as "direct physical loss," a reasonable jury could find that COVID-19 and the resulting pandemic proximately caused the business interruption because the orders were proximately caused by the pandemic. Indeed, in support of their position that Plaintiff's losses fall under a virus exclusion in the Policy, Defendant cites to numerous cases in which the courts also held that: "[e]ven if the Plaintiff's claimed losses arose from governmental action and not the virus itself, the virus exclusion applies to loss or damage caused 'directly or indirectly' by a virus."); *Family Tacos, LLC v. Auto Owners Ins. Co.*, 2021 WL 615307, at *23-24 (N.D. Ohio Feb. 17, 2021) exclusion); *Brunswick Panini's v. Zurich Am. Ins. Co.*, 2021 WL 663675, at *9 (N.D. Ohio Feb. 19, 2021) (applying a microorganism exclusion because COVID-19 is a virus as enumerated in the microorganism exclusion, and the orders closing indoor dining were issued as a result of the virus); *Robert E. Levy, D.M.D., LLC v. Hartford Fin. Servs. Grp.* Inc., 2021 WL 598818, at *5 (E.D. Mo. Feb. 16, 2021) ("Simply put, Plaintiffs allege their losses were caused by efforts to prevent the spread of COVID-19. The alleged losses fall squarely within the virus exclusion."). These cases support the same inference enumerated by the court in *Society*, *i.e.*, that COVID-19 proximately caused the closure orders. Defendant cannot have it both ways. Defendant cannot argue that the Limited Fungi, Bacteria or Virus Coverage endorsement excludes business interruption losses caused by the closure orders issued because of a virus, and then turn around and also argue that the civil authority orders were somehow issued in a way to only "prevent or limit the future spread of the coronavirus to people" while ignoring the existing direct physical damage to property caused by the virus making the properties affirmatively dangerous and deadly to human health contributing to that future spread, in order to preclude coverage under the Policy's Civil Authority provision. To give effect to both interpretations would lead to contradictory conclusions which demonstrates the existence of ambiguity and uncertainty in the Policy and as a

result, should be strictly construed against Defendant. *See Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1352 (Ohio 1982); *Heyman*, 653 A.2d 122, at 132. In the instant case, Plaintiff argues and this Court should find that the Policy's Limited Fungi, Bacteria or Virus Coverage does not exclude Plaintiff's losses for this reason and for those discussed above and that the Civil Authority provision of the policy affords coverage to Plaintiff for its losses due to the closure orders issued as a result of the virus.

Finally, and in the alternative, to the extent the Court accepts Defendant's interpretation of the undefined "prohibits-access" phrase as reasonable, the Civil Authority provision is ambiguous, and dismissal is inappropriate. "[I]f a term is not defined in the policy," as here, "the Court *must* look to the plain meaning of the words, not persuasive authority from other courts." *Henderson Road*, 2021 WL 168422 at *12. Defendant fails to provide *any* text-based support for its interpretation of "prohibits access." Therefore, coverage should be construed in favor of Plaintiffs at this early stage, and the parties should be permitted to develop an evidentiary record to answer the factual inquiry presented by the ambiguous language.

## VI. CONCLUSION

For the reasons stated above, Defendant's Motion should be denied.

Dated: July 19, 2021

Respectfully submitted,

*<u>/s/ Kathleen L. Nastri</u>*
Kathleen L. Nastri
**KOSKOFF & BIEDER PC**
350 Fairfield Avenue, Suite 501
Bridgeport, Connecticut 06604
Telephone: 203-226-4421
knastri@koskoff.com

Adam J. Levitt (admitted *pro hac vice*)
Amy E. Keller*

Daniel R. Ferri*
Mark Hamill*
Laura E. Reasons*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com
lreasons@dicellolevitt.com

Mark A. DiCello*
Kenneth P. Abbarno (admitted *pro hac vice*)
Mark Abramowitz*
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio 44060
Telephone: 440-953-8888
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

W. Mark Lanier*
Alex Brown*
Ralph (Skip) McBride*
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
Telephone: 713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Timothy W. Burns (admitted *pro hac vice*)
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com

jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas 77057
Telephone: 713-917-0024
douglas.daniels@dtlawyers.com

***Counsel for Plaintiff and the Proposed Classes***

*Applications for admission *pro hac vice* to be filed.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on July 19, 2021, that the undersigned electronically filed and served the foregoing document through this Court's ECF system to all counsel of record in this action.

*/s/ Kathleen L. Nastri*
Kathleen L. Nastri
**KOSKOFF & BIEDER PC**
350 Fairfield Avenue, Suite 501
Bridgeport, Connecticut 06604
Telephone: 203-226-4421
knastri@koskoff.com