UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
DR. JEFFREY MILTON, DDS, INC. :    Civ. No. 3:20CV00640(SALM)
                              :
v.                            :
                              :
HARTFORD CASUALTY INSURANCE   :
COMPANY                       :    March 1, 2022
                              :
------------------------------x
```

## RULING ON MOTION TO DISMISS [Doc. #39]

Defendant Hartford Casualty Insurance Company (hereinafter "The Hartford") has filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) seeking to dismiss the Amended Complaint in its entirety. [Doc. #39]. Plaintiff Dr. Jeffrey Milton, DDS, Inc. d/b/a Olentangy Pediatric Dentistry (hereinafter "plaintiff") has filed a memorandum in opposition to the motion to dismiss [Doc. #40], to which The Hartford has filed a reply [Doc. #41]. For the reasons stated herein, the Motion to Dismiss [**Doc. #39**] is **GRANTED**.

## I.   PROCEDURAL BACKGROUND

Plaintiff brought this action on May 8, 2020, against The Hartford. See Doc. #1 at 4.[1] On October 30, 2020, The Hartford answered the Complaint. [Doc. #23]. Plaintiff filed an Amended

---

[1] Throughout this Ruling, the Court cites to the page numbers reflected in each document's ECF header, rather than any numbering applied by the filing party.

Complaint on April 19, 2021. [Doc. #32]. The Hartford sought a
pre-filing conference with Judge Janet Bond Arterton, then the
presiding judge, asserting that it had grounds to dismiss the
claims against it. See Doc. #33. After a conference with the
parties, Judge Arterton entered an order permitting plaintiff to
file a Second Amended Complaint, and setting a briefing schedule
for The Hartford's motion to dismiss. See Doc. #36. No Second
Amended Complaint was filed. The Hartford filed the instant
Motion to Dismiss on June 25, 2021. See Doc. #39. This matter
was transferred to the undersigned on November 1, 2021. See Doc.
#44.

　　　Plaintiff seeks to proceed with this matter as a Class
Action. See Doc. #32 at 25-29. Because the Court finds the
Complaint fails to state a claim, the Court need not address the
class allegations.

**II.   FACTUAL BACKGROUND**

　　　Plaintiff "owns and operates Olentangy Pediatric Dentistry,
located in Powell, Ohio." Doc. #32 at 1. Defendant "issued
Policy No. 40 SBA PI2050 to Plaintiff Olentangy for a policy
period of July 28, 2019 to July 28, 2020, including
a Specialty Property Coverage Form[,]" id. at 11, which provides
coverage for "actual loss of Business Income sustained due to
the necessary suspension of its operations during the 'period of

restoration' caused by direct physical loss or damage." Id. at 12.

In March 2020, the State of Ohio issued orders in response to the spread of COVID-19 "requiring the cancellation of non-essential or elective surgeries[]" and "the closure of non-essential businesses." Id. at 21. As a result of these orders and the spread of COVID-19, "Plaintiff was required to drastically reduce operations at its office, and even to close entirely." Id. at 9.

Plaintiff further contends: "On information and belief, persons who were pre-symptomatic or asymptomatic and unknowingly carrying the coronavirus, including but not limited to employees, customers, and other business visitors, were present at insured property on various dates during 2020." Id. at 23. Plaintiff alleges that:

> The presence of COVID-19 caused "direct physical loss of or physical damage to" covered property under Plaintiff's policy, and the policies of the other Class members, by: (i) structurally altering and diminishing functional space of covered property; (ii) denying use of and damaging the covered property; (iii) requiring physical repair and/or alterations to the covered property; and/or (iv) by causing a necessary suspension of operations during a period of restoration.

Id. at 24.

The Policy, by its terms, provides coverage "for direct physical loss of or physical damage to Covered Property ... caused by or resulting from a Covered Cause of Loss." Doc. #1-1

at 27.[2] The Policy covers "Business Income" losses as follows:
"We will pay for the actual loss of Business Income you sustain
due to the necessary suspension of your 'operations' during the
'period of restoration'. The suspension must be caused by direct
physical loss of or physical damage to property at the
'scheduled premises'." Id. at 36. The Policy also provides
"Civil Authority" coverage as an extension of the "Business
Income" coverage. See id. at 37. The "Civil Authority" provision
provides:

> This insurance is extended to apply to the actual loss
> of Business Income you sustain when access to your
> "scheduled premises" is specifically prohibited by order
> of a civil authority as the direct result of a Covered

---

[2] "'When deciding a motion to dismiss, a district court may
consider documents attached to the complaint or incorporated by
reference into the complaint[,]' including an insurance policy
referenced in the complaint." Harvey B. Pats, M.D., P.A. v.
Hartford Fire Ins. Co., No. 3:20CV00697(SALM), 2021 WL 5988571,
at *3 (D. Conn. Dec. 17, 2021) (quoting New Image Roller Dome,
Inc. v. Travelers Indem. Co. of Ill., 310 F. App'x 431, 432 (2d
Cir. 2009)). "Even where a document is not incorporated by
reference, the court may nevertheless consider it where the
complaint 'relies heavily upon its terms and effect,' which
renders the document 'integral' to the complaint." Chambers v.
Time Warner, 282 F.3d 147, 152 (2d. Cir 2002) (quoting Int'l
Audiotext Network v. American Tel. & Tel. Co., 62 F.3d 69, 72
(2d Cir. 1995) (per curiam)). This generally occurs when the
document is "a contract or other legal document containing
obligations upon which the plaintiff's complaint stands or
falls[.]" Glob. Network Commc'ns, Inc. v. City of New York, 458
F.3d 150, 157 (2d Cir. 2006). Here, plaintiff attached a copy of
the Policy in its entirety to the Complaint but did not attach a
copy to the Amended Complaint, the operative pleading.
Nonetheless, the Court may consider this document in its ruling
on defendant's Motion to Dismiss because it is referred to in
plaintiff's Amended Complaint and is central to plaintiff's
claims.

Cause of Loss to property in the immediate area of your "scheduled premises".

Id. The Policy also includes "Extra Expense" coverage, which provides that The Hartford "will pay reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises' ... caused by or resulting from a Covered Cause of Loss." Id. at 36.

The Policy includes an endorsement titled "Limited Fungi, Bacteria or Virus Coverage" (hereinafter "Virus Endorsement") which contains the following exclusionary language (hereinafter "Virus Exclusion"):

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss: (1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus.

Id. at 126. The endorsement also contains the following "Time Element Coverage":

> If the loss which resulted in "fungi", wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive. If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet or dry

rot, bacteria or virus, but remediation of "fungi", wet or dry rot, bacteria or virus prolongs the "period of restoration", we will pay for loss and expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive.

Id. at 127-28. Although the parties dispute the import of these provisions, they do not dispute that they are included in the relevant Policy.

Plaintiff asserts: "Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Business Income, Extra Expense, and Civil Authority provisions of the Hartford Casualty policy." Doc. #32 at 14. "Plaintiff submitted a claim for loss to Hartford Casualty under its policy due to the presence of COVID-19 and the Closure Orders, but Hartford Casualty denied that claim." Id. at 25. The Hartford denied plaintiff's claim for Business Income Coverage, Civil Authority Coverage, and Extra Expense Coverage. See id. at 31-33.

## III. MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); accord Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854

(2d Cir. 2021). In reviewing such a motion, the Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." Kaplan, 999 F.3d at 854 (citations omitted).

"[W]hile this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or naked assertions devoid of further factual enhancement." Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678 (citations and quotation marks omitted).

## IV.  CHOICE OF LAW

The parties agree that there is no conflict between Connecticut and Ohio law regarding contract interpretation. See Docs. #39-1 at 13, #40 at 15. Defendant addresses the law of both Connecticut and Ohio in its motion, see Doc. #39-1 at 13; plaintiff asserts that "Connecticut law applies to this case by default because it is the law of the forum and neither party has identified an actual conflict of laws between Ohio and Connecticut." Doc. #40 at 15.

Where there is no conflict, the Court does not need to conduct a choice of law analysis. See, e.g., Ali v. Fed. Ins.

<u>Co.</u>, 719 F.3d 83, 90 n.12 (2d Cir. 2013) ("Because there is no conflict between the relevant substantive law in these states, however, we dispense with any choice of law analysis."); <u>Wall v. CSX Transp., Inc.</u>, 471 F.3d 410, 422 (2d Cir. 2006) ("As there is no conflict, for practical reasons, that is, for ease of administrating the case, New York, as the forum state, would apply its law."); <u>Lumbermens Mut. Cas. Co. v. Dillon Co., Inc.</u>, 9 F. App'x 81, 84 (2d Cir. 2001) ("Finding no conflict between Connecticut law and Rhode Island law with respect to the disputed issue, we need not conduct a choice of law analysis pursuant to Connecticut's choice of law rules. Rather, we apply the law common to these jurisdictions.").

The Court therefore applies Connecticut law, but has consulted Ohio law as well.

## V.   <u>LAW REGARDING INTERPRETATION OF INSURANCE POLICIES</u>

Under Connecticut law, "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract. ... If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." <u>Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.</u>, 84 A.3d 1167, 1173 (Conn. 2014) (citation and quotation marks omitted). The "policy language remains the touchstone of our inquiry." <u>Conn. Ins. Guar. Ass'n</u>

v. Fontaine, 900 A.2d 18, 22 (Conn. 2006).

The "rule of construction that favors the insured in case of ambiguity applies only when the terms are, without violence, susceptible of two equally reasonable interpretations." Misiti, LLC v. Travelers Prop. Cas. Co. of Am., 61 A.3d 485, 491 (Conn. 2013) (citation and quotation marks omitted).

> In determining whether the terms of an insurance policy are clear and unambiguous, a court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.

Zulick v. Patrons Mut. Ins. Co., 949 A.2d 1084, 1088 (Conn. 2008) (citation and quotation marks omitted). The Court will not find that ambiguity exists "simply because lawyers or laymen contend for different meanings[]" of certain words, or "simply because a contract fails to define them[.]" New London Cnty. Mut. Ins. Co. v. Nantes, 36 A.3d 224, 235 (Conn. 2012) (citations and quotation marks omitted); see also Misiti, LLC, 61 A.3d at 491 ("The fact that the parties advocate different meanings of the insurance policy does not necessitate a conclusion that the language is ambiguous." (citations and quotation marks omitted)).

Similarly, under Ohio law, insurance contracts are interpreted "utilizing ... the familiar rules of construction

and interpretation applicable to contracts generally." <u>Gomolka</u>
<u>v. State Auto. Mut. Ins. Co.</u>, 436 N.E.2d 1347, 1348 (Ohio 1982).
"The meaning of a contract is to be gathered from a
consideration of all its parts, and no provision is to be wholly
disregarded as inconsistent with other provisions unless no
other reasonable construction is possible." <u>Marusa v. Erie Ins.</u>
<u>Co.</u>, 991 N.E.2d 232, 233 (Ohio 2013) (citation and quotation
marks omitted). "[W]ords and phrases used in an insurance policy
must be given their natural and commonly accepted meaning, where
they in fact possess such meaning, to the end that a reasonable
interpretation of the insurance contract consistent with the
apparent object and plain intent of the parties may be
determined." <u>Gomolka</u>, 436 N.E.2d at 1348; <u>see also</u> <u>Nationwide</u>
<u>Mut. Fire Ins. Co. v. Guman Bros. Farm</u>, 652 N.E.2d 684, 686
(Ohio 1995) ("A court must give undefined words used in an
insurance contract their plain and ordinary meaning."). However,
where an ambiguity exists, the language "should be interpreted
in favor of the insured." <u>Andersen v. Highland House Co.</u>, 757
N.E.2d 329, 334 (Ohio 2001).

## VI.   <u>DISCUSSION</u>

The Hartford asserts that this action should be dismissed
in its entirety on the grounds that: (1) "the policy does not
cover losses caused by a virus[;]" (2) "Plaintiff ... fails to
allege any direct physical loss or damage to property[;]" and

(3) "Plaintiff is not entitled to 'civil authority' coverage[.]"
Doc. #39-1 at 8-9. Plaintiff opposes the motion to dismiss on
all grounds, contending that (1) the Virus Exclusion does not
apply; (2) direct physical loss has been alleged due to the
presence of COVID-19 on the premises and the loss of use of the
property; and (3) plaintiff has met all requirements for Civil
Authority coverage. See Doc. #40 at 10-11.

    **A.**   **VIRUS ENDORSEMENT**

       1.  Virus Exclusion

The Court begins with the threshold interpretive issue of
the language of the Virus Exclusion. Plaintiff is one of the
many businesses that insured its business against certain losses
with a Policy containing identical or nearly identical
exclusionary language that excludes coverage for the
"[p]resence, growth, proliferation, spread or any activity of
'fungi', wet rot, dry rot, bacteria or virus." Doc. #1-1 at 126.
Due to the widespread denial of claims for losses resulting from
COVID-19, courts nationwide have had the opportunity to address
whether this exclusionary language is ambiguous, and numerous
courts, including those in both Connecticut and Ohio, have found
that it is not. See, e.g., Harvey B. Pats, M.D., P.A., 2021 WL
5988571, at *5; One40 Beauty Lounge LLC v. Sentinel Ins. Co.,
Ltd., No. 3:20CV00643(KAD), 2021 WL 5206387, at *2 (D. Conn.
Nov. 9, 2021), appeal docketed No. 21-3007 (2d Cir. Dec. 9,

2021); Cosm. Laser, Inc. v. Twin City Fire Ins. Co., No.
3:20CV00638(SRU), 2021 WL 3569110, at *7-11 (D. Conn. Aug. 11,
2021), appeal docketed No. 21-2160 (2d Cir. Sept. 9, 2021);
Little Stars, LLC v. Sentinel Ins. Co., Ltd., No.
3:20CV00609(AVC), 2021 WL 3629419, at *3-4 (D. Conn. Aug. 12,
2021); Sys. Optics, Inc. v. Twin City Fire Ins. Co., No.
5:20CV01072(SL), 2021 WL 2075501, at *3-8 (N.D. Ohio May 24,
2021), appeal docketed No. 21-3556 (6th Cir. Jun. 21, 2021).
This Court agrees.

The Policy excludes coverage for any loss or damage caused
directly or indirectly by a virus. The language is clear and
unambiguous: "We will not pay for loss or damage caused directly
or indirectly by ... [p]resence, growth, proliferation, spread
or any activity of ... virus." Doc. #1-1 at 126. There is only
one way to read this language: Any loss caused by any virus is
excluded from coverage under this provision of the Policy.

Plaintiff does not contest that COVID-19 is a virus. See
generally Doc. #32 (repeatedly referring to COVID-19 as "the
virus"); see also Sys. Optics, Inc., 2021 WL 2075501, at *6
(Plaintiff "concedes, as it must, that the COVID-19 disease (and
the pandemic that resulted) was caused by a virus[.]"). Rather,
it contends that the Virus Exclusion is not applicable to this
virus. Because the Court finds that the Policy language
unambiguously excludes losses caused by viruses, and COVID-19 is

a virus, the Court need not engage in the methods of construction plaintiff suggests. Nonetheless, the Court will address each of plaintiff's arguments in turn.

Despite the clear language of the Policy and the wide consensus across Districts, including this one, that the Virus Exclusion is not ambiguous, plaintiff contends that (1) the Court should apply the canon of construction ejusdem generis and find that "virus," as used in the Virus Exclusion, applies only to wood disease; and (2) if defendant intended to exclude viruses pertaining to human health, such as COVID-19, it would have used the 2006 ISO Endorsement that expressly excludes communicable diseases. See Doc. #40 at 16-20.

The ejusdem generis canon of construction "is not in and of itself a rule of interpretation, but merely an aid to interpretation when the intention is not otherwise apparent, and it never controls when it clearly appears from the instrument that no such limitation was intended[.]" Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1020 (2d Cir. 1985) (citation and quotation marks omitted). Where, as here, the language is clear and unambiguous, the Court need not utilize a canon of construction to aid in interpretation.

Even assuming, arguendo, that the Court sought to apply ejusdem generis, it would not support plaintiff's reading of the Policy. Ejusdem generis provides "that when a general word or

phrase follows a list of specifics, the general word or phrase
will be interpreted to include only items of the same class as
those listed." <u>Ejusdem Generis</u>, Black's Law Dictionary (11th ed.
2019); <u>see also</u> <u>Cosm. Laser, Inc.</u>, 2021 WL 3569110, at *9 ("'In
all contexts other than the pattern of specific-to-general, the
proper rule to invoke is the broad associated-words canon, not
the narrow <u>ejusdem</u> <u>generis</u> canon.'" (quoting A. Scalia & B.
Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 205
(2012))). Here, the term "virus" is no more general than
"'fungi', wet rot, dry rot, [or] bacteria[.]" Doc. #1-1 at 126.
It "is <u>not</u> a general or collective term following a list of
specific items to which a particular statutory command is
applicable (<u>e.g.</u>, fishing rods, nets, hooks, bobbers, sinkers,
and other equipment)." <u>CSX Transp., Inc. v. Alabama Dep't of
Revenue</u>, 562 U.S. 277, 294 (2011) (citation and quotation marks
omitted).

Plaintiff asserts that application of <u>ejusdem</u> <u>generis</u> would
require the finding that the exclusion would be limited in scope
to only wood diseases. <u>See</u> Doc. #40 at 17-19. However, it is not
true that all terms in the list apply exclusively to wood
diseases. In fact, the Policy itself defines "fungi," the first
word in the series, as "<u>any</u> type or form of fungus, including
mold or mildew, and any mycotoxins, spores, scents or by-
products produced or released by fungi." Doc. #1-1 at 128

(emphasis added). This definition does not reference, or in any
way indicate, that the exclusion of losses caused by fungi is
intended to apply to wood diseases only. Additionally, the
definition of bacteria includes "microorganisms that typically
live in soil, water, organic matter, or the bodies of plants and
animals," and is likewise not limited to wood only. Bacterium,
Merriam-Webster, https://www.merriam-
webster.com/dictionary/bacterium (last visited February 24,
2022) (emphasis added). Accordingly, not only would ejusdem
generis be improperly applied here, but it also would not result
in a finding that the term "virus" was meant to reference
viruses impacting only wood.

        Plaintiff's argument that The Hartford should have used the
2006 ISO Endorsement similarly lacks merit. Plaintiff is
effectively arguing that the existence of the 2006 ISO
Endorsement, which contains language that is more specific to
communicable viruses, renders the current policy language
ambiguous. "Because the Virus Exclusion and the 2006 ISO
Endorsement both bar COVID-related coverage for loss of use, it
was unnecessary to include the 2006 ISO Endorsement in the
Policy." Cosm. Laser, Inc., 2021 WL 3569110, at *10 (collecting
cases). "'This argument simply amounts to stating that
Defendants could have drafted a clearer exclusion; but that does
not mean that the exclusion at issue is ambiguous.'" Id.

(quoting Robert E. Levy, D.M.D., LLC v. Hartford Fin. Servs. Grp. Inc., 520 F. Supp. 3d 1158, 1167 (E.D. Mo. 2021)). Plaintiff "cannot introduce ambiguity into the Policy by pointing to different language from different contracts." Id.

Because the Court finds that the language of the Virus Exclusion is unambiguous, both Connecticut and Ohio law require the Court to apply the "natural and ordinary meaning[]" of the Virus Exclusion. Lexington Ins. Co., 84 A.3d at 1173; see also Gomolka, 436 N.E.2d at 1348. Accordingly, the Court concludes that the Virus Exclusion unambiguously excludes losses caused by COVID-19. See Harvey B. Pats, M.D., P.A., 2021 WL 5988571, at *5 ("'The Virus Exclusion in Plaintiff's Policy is unambiguous and, by its plain meaning, applies to claims made for losses caused by the COVID-19 virus.'" (quoting One40 Beauty Lounge LLC, 2021 WL 5206387, at *2)).

Thus, plaintiff's losses are excluded by the Policy if they were caused by COVID-19. The Hartford asserts that "Plaintiff's alleged business interruption claims were directly or indirectly caused by the coronavirus[.]" Doc. #39-1 at 18. Plaintiff does not challenge this assertion. Rather, plaintiff's Amended Complaint makes it clear that COVID-19 is the claimed cause of loss. See, e.g., Doc. #32 at 9 ("[A]n ordinary person would understand and say that COVID-19 caused the loss or damage."); id. at 12 ("Losses due to COVID-19 are a Covered Cause of

Loss[.]"); id. at 14 ("Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Business Income, Extra Expense, and Civil Authority provisions of the Hartford Casualty policy.").

> The Policy language "makes the causal scope of the virus exclusion broad and suggests that it should apply as long as a virus acts as a link somewhere in the causal chain producing the loss or damage at issue. That formulation is easily satisfied in this case." LJ New Haven LLC v. AmGUARD Ins. Co., 511 F. Supp. 3d 145, 151 (D. Conn. 2020). There can be no serious dispute that plaintiff's claimed losses were "caused directly or indirectly" by the COVID-19 virus; indeed, the ... Amended Complaint alleges exactly that.

Harvey B. Pats, M.D., P.A., 2021 WL 5988571, at *5. Because COVID-19 was the cause of plaintiff's loss, and COVID-19 is a virus, that loss is subject to the terms of the Virus Exclusion.

In sum, the Court finds that the Virus Exclusion, on its own, unambiguously excludes plaintiff's losses.

2. Limited Coverage

Plaintiff further argues that, even if the Virus Exclusion excludes general coverage, limited coverage is available under Subsection B.1.f. of the Virus Endorsement. See Doc. #40 at 22-27. Plaintiff argues that Subsection B.1.f must be read independently of Subsection B.1.a, see id. at 24-27, which requires that the loss be the result of a "'specified cause of loss' other than fire or lightning[,]" or "Equipment Breakdown[.]" Doc. #1-1 at 127. Defendant responds that the

limited coverage found in Subsection B.1.f does not apply because "'[i]t is inappropriate to consider §B.1.f. in a vacuum separate and apart from the other provisions in the endorsement.'" Doc. #41 at 9 (quoting Sys. Optics, Inc., 2021 WL 2075501, at *7).

The reading of Subsection B.1.f. that plaintiff suggests would require the Court to read Subsection B.1.f. in isolation. "A contract of insurance must be viewed in its entirety[.]" Misiti, LLC, 61 A.3d at 490-91 (citations and quotation marks omitted); see also Laboy v. Grange Indemn. Ins. Co., 41 N.E.3d 1224, 1227 (Ohio 2015) ("The fundamental goal when interpreting an insurance policy is to ascertain the intent of the parties from a reading of the policy in its entirety[.]" (emphasis added)). Reading Subsection B.1.f. entirely independently of the remainder of Section B would directly contradict the requirement that the Court view the Policy in its entirety. This Court joins the others within the Second and Sixth Circuits that decline to read Subsection B.1.f. in isolation. See J&H Lanmark, Inc. v. Twin City Fire Ins. Co., No. 5:20CV00333(DCR), 2021 WL 922057, at *4 (E.D. Ky. Mar. 10, 2021) ("The Court declines to view this single provision in isolation. Instead, the Policy, including the Virus Endorsement, must be viewed as a complete document and the terms must be read in way that gives meaning to all of them, to the extent possible.");

Sys. Optics, Inc., 2021 WL 2075501, at *8 (Section "B.1.f. does not provide for standalone coverage, and the endorsement must be read in its entirety[.]"); Cosm. Laser, Inc., 2021 WL 3569110, at *10 ("Cosmetic Laser's view -- that its loss of use might be covered under Subsection B.1.f -- takes Subsection B.1.f entirely out of context and violates basic principles of contract interpretation."); One40 Beauty Lounge LLC, 2021 WL 5206387, at *4 ("[T]his Court agrees ... that Section B.1.f does not provide coverage for thirty days of losses occasioned by the COVID-19 virus."); Leal, Inc. v. Twin City Fire Ins. Co., No. 3:20CV00917(AVC), 2021 WL 5370091, at *9 (D. Conn. Nov. 10, 2021), appeal docketed No. 21-3023 (2d Cir. Dec. 13, 2021) ("[T]he court finds no basis for coverage under this limited provision.").

Thus, for plaintiff to be afforded coverage under Subsection B.1.f., it must show that the losses were a result of equipment breakdown or a specified cause of loss, which is defined by the Policy as: "Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." Doc. #1-1 at 51. Plaintiff makes no argument, nor could it, that its losses, admittedly caused by

COVID-19, were a result of equipment breakdown or specified cause of loss.

Furthermore, Subsection B.1.f., even if read in isolation, refers to a "loss which resulted in 'fungi', wet or dry rot, bacteria or virus[.]" Id. at 127 (emphasis added). In other words, Subsection B.1.f. would only apply if the loss caused the virus. Applied to this case, that would mean that plaintiff's suspension of operations and its loss of business income caused COVID-19. Here, plaintiff asserts, as it must, exactly the opposite: that the virus resulted in the loss, not that the loss resulted in the virus. Plaintiff "has failed to state a ... 'loss which resulted in [a] virus.'" Leal, Inc., 2021 WL 5370091, at *8. Accordingly, there is no basis for coverage under the limited coverage found in the Virus Endorsement.

**B.   DIRECT PHYSICAL LOSS OR DAMAGE**

Even if plaintiff's policy did not unambiguously exclude losses caused by COVID-19, the Policy requires that the loss be a result of "direct physical loss or damage to" plaintiff's property.[3] Defendant asserts: "Even if the Virus Exclusion were

---

[3] Plaintiff seeks coverage under the Business Income, Extra Expense, and Civil Authority provisions of the Policy. See Doc. #32 at 2. The "Business Income" provision of the Policy reads:

> **(1)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or

not applicable ... , Plaintiff has not stated a plausible claim

for Business Income or Extra Expense coverage because coverage

under these provisions is triggered only where there is 'direct

physical loss of or physical damage to' property at the premises

insured by the Policy, and only during a 'period of

restoration'." Doc. #39-1 at 20. Plaintiff responds that it "has

stated a plausible claim under the Business Income and Extra

Expense provisions of the Policy because Plaintiff has

sufficiently alleged 'direct physical loss of or physical damage

to' Plaintiff's Covered Property." Doc. #40 at 27. Specifically,

plaintiff asserts that it "pled the presence of COVID-19 at its

property and that Plaintiff's property was rendered unduly

---

physical damage to property at the "scheduled premises",
including personal property in the open (or in a vehicle)
within 1,000 feet of the "scheduled premises", caused by
or resulting from a Covered Cause of Loss.

Doc. #1-1 at 36. Similarly, the "Extra Expense" provision of the
Policy reads:

**(1)** We will pay reasonable and necessary Extra Expense
you incur during the "period of restoration" that you
would not have incurred if there had been no direct
physical loss or physical damage to property at the
"scheduled premises", including personal property in the
open (or in a vehicle) within 1,000 feet, caused by or
resulting from a Covered Cause of Loss.

Id. Both forms of coverage require a "direct physical loss or
damage to" the insured property. The Civil Authority provision
is addressed infra.

dangerous and unusable for its intended use," thus "adequately alleg[ing] physical damage and loss." Id. at 32.

   As was true of the Virus Exclusion, courts nationwide have had the opportunity to consider whether losses caused by COVID-19 qualify as "direct physical loss or damage" as required by the Policy. This Court joins the growing number that have concluded that losses caused by the mere presence of COVID-19 are not "direct physical loss or damage" to the insured's property.[4] See, e.g., Santo's Italian Café LLC v. Acuity Ins.

_____

[4] On January 14, 2022, the Court issued an order giving the parties the opportunity to submit supplemental briefing regarding "the potential impact of" the Second Circuit's opinion in 10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd., 21 F.4th 216 (2d Cir. 2021). Doc. #47. On January 28, 2022, each party submitted a supplemental memorandum in response to this order. See Docs. #48, #49. In its supplemental memorandum, plaintiff asserts that 10012 Holdings, Inc. is not controlling here for two reasons. First, plaintiff observes that the Second Circuit was applying New York law, rather than Connecticut law, asserting that the distinction is meaningful here. See Doc. #49 at 2. Plaintiff asserts that this distinction is meaningful because of the Second Circuit's reliance on Roundabout Theatre Co. v. Cont'l Cas. Co., 302 A.D.2d 1 (2002), an argument it supports only by stating that only one Connecticut Court has applied Roundabout Theatre Co. See id. The Court in Roundabout Theatre Co. considered the question of whether "the language of the business interruption clause in the policy clearly and unambiguously provides coverage only where there is direct physical loss or damage to the insured's property[.]" 302 A.D.2d at 2. With respect to questions of ambiguity, "both Connecticut and New York law share the same principles for interpreting insurance policies." Wiener v. AXA Equitable Life Ins. Co., No. 16CV04019(ER), 2021 WL 1226925, at *7 (S.D.N.Y. Mar. 31, 2021) (conducting a full comparison of New York and Connecticut law regarding interpretation of insurance contracts). Additionally, one court in this District has applied 10012 Holdings, Inc. to Connecticut law and concluded that the Connecticut Supreme Court

Co., 15 F.4th 398, 401 (6th Cir. 2021) (Applying Ohio law:
"Whether one sticks with the terms themselves (a 'direct
physical loss of' property) or a thesaurus-rich paraphrase of
them (an 'immediate' 'tangible' 'deprivation' of property), the
conclusion is the same. The policy does not cover this loss.");
10012 Holdings, Inc., 21 F.4th at 223 (Applying New York law:
"Because 10012 Holdings alleges only that it lost access to its
property as a result of COVID-19 and the governmental shutdown
orders, and not that it suspended operations because of physical
damage to its property, we agree ... that 10012 Holdings cannot
recover under either the Business Income or Extra Expense
provisions."); Rye Ridge Corp. v. Cincinnati Ins. Co., No. 21-

---

would not find that loss of use would be sufficient to allege
physical loss or damage to the property. See Conn. Children's
Med. Ctr. v. Cont'l Cas. Co., No. 3:21CV00291(JAM), 2022 WL
168786, at *4-6 (D. Conn. Jan. 19, 2022). Plaintiff asserts that
Conn. Children's Med. Ctr. "got the prediction wrong[.]" Doc.
#49 at 2. As discussed infra, the Court agrees with the court in
Conn. Children's Med. Ctr. Second, plaintiff asserts that "10012
Holdings did not even attempt to allege that it suffered direct
physical loss or damage to its property due to the threat or
presence of COVID-19 at its art gallery[.]" Id. at 3. However,
the Second Circuit has since applied 10012 Holdings, Inc. in
Kim-Chee LLC v. Philadelphia Indem. Ins. Co. See No. 21-1082-cv,
2022 WL 258569, *1-2 (2d Cir. Jan. 28, 2022). The plaintiff in
Kim-Chee LLC made substantially similar allegations to plaintiff
here, alleging that the virus "'was present at, in, throughout,
and on Plaintiffs' Premises and property within one mile of
Plaintiffs' property,' and that '[p]roperty in the immediate
area of Plaintiffs' Premises ... was exposed to the Virus' and
'had the Virus on surfaces therein.'" 2022 WL 258569, at *2.
Accordingly, the Court finds that 10012 Holdings, Inc. is
controlling in this case.

1323-cv, 2022 WL 120782, at *1-2 (2d Cir. Jan. 13, 2022)
(summary order) (applying New York law: relying on 10012
Holdings to affirm the District Court's ruling that plaintiff
did not suffer a direct physical loss); Estes v. Cincinnati Ins.
Co., 23 F.4th 695, 701 (6th Cir. 2022) (Applying Kentucky law:
"[W]e interpret[] the phrase 'direct physical loss' to require
what businesses in this COVID-19 context cannot show: a tangible
destruction or deprivation of property."); Conn. Children's Med.
Ctr., 2022 WL 168786, at *6 (Applying Connecticut law:
"[W]hether the theory is based on 'loss of use' of property or
based on 'physical damage' from the COVID-19 virus itself, the
result is the same: there is no 'direct physical loss or damage'
to property."); Kim-Chee LLC, 2022 WL 258569, at *1-2 (applying
New York law: denying coverage based on the inability of COVID-
19 to cause direct physical loss or damage to property, even in
absence of a virus exclusion).

Plaintiff asserts that it suffered "'direct physical loss
of or damage' to" its property "because COVID-19 made the
property unusable in the way it had been used before COVID-19."
Doc. #32 at 8. Plaintiff further asserts that "COVID-19
structurally altered the surfaces of covered property and
ambient air within covered property[]" and resulted in a "loss
of functionality of the space for business purposes." Id. at 9-
10. As to the structural alteration, plaintiff contends that

"respiratory droplets ... expelled from infected individuals land on, attach, and adhere to surfaces and objects[,]" thus "structurally chang[ing] the property and its surface by becoming a part of that surface[]" and the particles that remain in the air "alter[] the structural properties of air in buildings from safe and breathable to unsafe and dangerous." Id. at 19. Plaintiff also asserts that COVID-19 "requir[ed] physical repair and/or alterations to the covered property[,]" such as "installation of new HEPA filters ... , new nitrous oxide hoses, ... a new autoclave for sterilization[,]" new signage, "numerous barriers, shields, and plexiglass throughout the Covered Property[;]" and "remov[al of] waiting room chairs to permit proper spacing for social distancing[.]" Id. at 24. Each of plaintiff's claims of direct physical loss or damage can be placed into one of two categories: (1) that the mere presence of COVID-19 at the premises resulted in direct physical damage and loss of use of the property, or (2) that the reconfigurations that plaintiff made to the property to mitigate the harms posed by COVID-19 constituted direct physical damage. Neither is sufficient to show direct physical loss or damage.

With respect to the presence of COVID-19 on plaintiff's property, plaintiff asserts that a showing of physical alteration is not required to adequately allege direct physical loss or damage. See Doc. #40 at 27-40. Plaintiff has provided

citations to a number of cases to support its argument that direct physical loss or damage does not require physical alteration. See Doc. #40 at 28-29. However, these cases do not easily lend support to plaintiff's argument, as most do not apply Connecticut or Ohio law.[5] "Under both Ohio and Connecticut law, 'direct physical loss' requires physical alteration of property." Cosm. Laser, Inc., 2021 WL 3569110, at *13.

Courts applying Connecticut or Ohio law have widely rejected the argument that the presence of COVID-19 in the air or on the surfaces at an insured's property causes "direct physical damage" to the property. See, e.g., id. ("The presence of COVID-19 at [plaintiff's] propert[y] did not physically alter [that] propert[y]. For that simple reason, neither the Policy's Business Income provision nor the Extra Expense provision applies to cover [plaintiff's] claim for loss of use."); Conn. Children's Med. Ctr., 2022 WL 168786, at *4 ("Many courts have

---

[5] Plaintiff cites only one case that applies Ohio law: Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co., 513 F. Supp. 3d 808 (N.D. Ohio 2021). See Doc. #40 at 29. However, that decision was vacated and remanded by the Sixth Circuit. See In re Zurich Am. Ins. Co., No. 21-0302-cv, 2021 WL 4473398 (6th Cir. Sept. 29, 2021). On remand, the Court relied on the Sixth Circuit's decision in Santo's Italian Café LLC to find that a direct physical loss of property requires more than a mere loss of use. See Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co., No. 1:20CV01239, 2021 WL 5085283, at *4-5 (N.D. Ohio Nov. 2, 2021), appeal docketed No. 21-4148 (6th Cir. Dec. 3, 2021). Accordingly, Henderson no longer provides support for the assertion that direct physical loss or damage does not require physical alteration.

rejected this 'COVID-19 causes physical damage' theory of
coverage. ... I am persuaded by these rulings[.]"); Ceres
Enters., LLC v. Travelers Ins. Co., 520 F. Supp. 3d 949, 961–62
(N.D. Ohio 2021), appeal docketed No. 21-3232 (6th Cir. Mar. 10,
2021) ("As discussed, the mere physical presence of the virus on
its property does not constitute physical loss under the policy
or Ohio law."); see also Brown Jug, Inc. v. Cincinnati Ins. Co.,
Nos. 21-2644/2715/2718, 2022 WL 538221, at *4 (6th Cir. Feb. 23,
2022) (applying Michigan law; finding that plaintiff's
allegations that COVID-19 droplets land on surfaces and
transform those surfaces into "fomites," "inanimate object[s]
(such as a countertop, dish, or doorknob) that may carry and
spread infections agents (such as bacteria or viruses)[]" as
"not actually alleg[ing] that the property was harmed[]").

The undersigned agrees that the presence of COVID-19 on the
surfaces or in the ambient air is not sufficient to allege
direct physical loss or damage, particularly in light of the
Connecticut Supreme Court's ruling in Capstone Bldg. Corp. v.
Am. Motorists Ins. Co., 67 A.3d 961 (Conn. 2013), and the Ohio
Appellate Court's ruling in Mastellone v. Lightning Rod Mut.
Ins. Co., 884 N.E.2d 1130 (Ohio Ct. App. 2008).

In Capstone Bldg. Corp., the court considered whether
elevated carbon monoxide levels could constitute "property
damage," and held that "the escape of carbon monoxide, without

more, is not property damage." 67 A.3d at 979. As with COVID-19,
the danger of carbon monoxide exists primarily due to the danger
it poses to human health when it is present in the air that
humans are breathing. "Although the Capstone decision involved
different policy language than the language at issue in this
case, it tends if anything to support the defendants here
because it interprets the term 'property damage' to require no
less than a physical and tangible alteration to the property."
Conn. Children's Med. Ctr., 2022 WL 168786, at *5. In fact,
carbon monoxide's flammable nature[6] means that it actually
possesses the ability to cause significant physical loss or
damage to property, unlike COVID-19, which poses a risk only to
human health.

Similarly, in Mallestone, the court considered whether the
presence of mold on wood siding constituted physical damage:

> We find that the Mastellones presented no evidence to
> show that the mold on the siding of their house
> constituted "physical damage" as that term is used in
> the policy. The presence of mold did not alter or
> otherwise affect the structural integrity of the siding.
> The experts all agreed that the mold was present only on
> the surface of the siding and could be removed without
> causing any harm to the wood. Absent any specific

---

[6] Carbon Monoxide is classified as "Highly Flammable[,]" and is
described as "easily ignited[,]" such that containers holding
carbon monoxide "may violently rupture and rocket." Chemical
Datasheet: Carbon Monoxide, CAMEO Chemicals, National Oceanic
and Atmospheric Administration,
https://cameochemicals.noaa.gov/chemical/335 (last visited
February 24, 2022).

alteration of the siding, the Mastellones failed to show
that their house suffered any direct physical injury as
required by the homeowners' policy.

884 N.E.2d at 1144-45; see also Santo's Italian Café LLC, 15
F.4th at 404 ("Mastellone offers a good reason to think that the
Supreme Court of Ohio, if faced with the question, would
conclude that Santo's Café has not alleged a 'physical loss of
or damage to' its property. So do other Ohio decisions that have
relied on Mastellone." (collecting cases)). Accordingly, the
Court finds that plaintiff's allegations that COVID-19 was
present in the ambient air and on the surfaces of its property
are not sufficient to allege direct physical loss or damage to
that property.

The Court next turns to plaintiff's argument that the
reconfigurations plaintiff made to its property constitute
direct physical loss or damage. Again, these allegations are not
sufficient to allege direct physical loss or injury. Plaintiff
installed air filters, physical barriers, and signage, and
removed chairs from the waiting room, in an effort to mitigate
the spread of COVID-19 among people who were on the premises.
These mitigation efforts were not related to any physical loss
or damage to the property.

> The virus damages humans, not physical structures.
> Plaintiffs' allegations that the virus is persistent and
> ubiquitous, and that it had to provide hand sanitizing
> stations, plexiglass shields, and COVID-related signage,
> enhance its HVAC system, and implement health screening

> and contact tracing measures, does not change this
> reality. Furthermore, hand sanitizing stations,
> plexiglass shields, COVID-related signage and an
> enhanced HVAC system are not there to replace or repair
> damage to the property, they are there to protect humans.

John Gore Org., Inc. v. Fed. Ins. Co., No. 21CV02200(PGG)(KHP),
2021 WL 6805891, at *7 (S.D.N.Y. Dec. 8, 2021); see also Brown
Jug, Inc., 2022 WL 538221, at *4 ("This outbreak purportedly
'damaged' the property, because [plaintiff] had to take
remediation measures, such as cleaning and reconfiguring spaces,
to reduce the threat of COVID-19. These, however, are precisely
the sorts of losses we have previously determined are 'not
tangible, physical losses, but economic losses.'"). This Court
likewise finds that any alterations plaintiff made in an effort
to slow the spread of COVID-19 among persons at the premises do
not constitute direct physical loss or damage.

Accordingly, because plaintiff has failed to allege any
facts supporting its claim that the insured property suffered a
direct physical loss or damage, plaintiff is not entitled to the
Business Income or Extra Expense coverage under the Policy.

### C.   CIVIL AUTHORITY COVERAGE

Finally, defendant asserts that plaintiff is not eligible
for Civil Authority Coverage because:

> (1) Plaintiff does not allege a Covered Cause of Loss
> (because virus-related losses are excluded), nor can it
> demonstrate harm to any property; (2) Plaintiff does not
> allege that it was specifically prohibited from

accessing its business premises; and (3) the orders of
civil authority were issued to address the future spread
of coronavirus to people, not because of existing
property damage or loss.

Doc. #39-1 at 26. Plaintiff responds that Civil Authority
Coverage applies because it requires only "that the civil
authority orders forbid customers and employees from using
Covered Property for their intended purposes." Doc. #40 at 11.
The Civil Authority Coverage in the Policy reads: "This
insurance is extended to apply to the actual loss of Business
Income you sustain when access to your 'scheduled premises' is
specifically prohibited by order of a civil authority as the
direct result of a Covered Cause of Loss to property in the
immediate area of your 'scheduled premises'." Doc. #1-1 at 37.

    The Civil Authority Coverage provides additional coverage
under the Business Income coverage provided in the Policy. The
Business Income coverage applies only when the insured has
sustained losses from a "suspension ... caused by direct
physical loss of or physical damage to property[.]" Doc. #1-1 at
36. Additionally, a "Covered Cause of Loss" is defined by the
Policy as "risks of direct physical loss unless the loss is ...
[e]xcluded ... or ... [l]imited[.]" Id. at 28. As the Court has
concluded that (1) plaintiff's loss is excluded under the Virus
Exclusion, and (2) that plaintiff did not suffer any direct

physical loss or physical damage, the Civil Authority Coverage does not apply.

Still, even if plaintiff were eligible for Business Income coverage, the Civil Authority Coverage provides coverage only when access to the premises is "prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of" the insured property. Doc. #1-1 at 37. Plaintiff provides no support for its conclusory assertion that this coverage includes being forbidden to use the property for its intended use, rather than being forbidden to sue the property for any use. Nor would this reading be consistent with the plain language of the Policy.

Applying the natural and ordinary meaning of the Civil Authority Coverage language, the Ohio closure orders did not prohibit access to plaintiff's property. Although the Amended Complaint makes the conclusory allegation that "[t]he Closure Orders prohibited access to Plaintiff's ... Covered Property, and the area immediately surrounding Covered Property, in response to dangerous physical conditions resulting from a Covered Cause of Loss[,]" Doc. #32 at 25, the other allegations of the Amended Complaint do not support that plaintiff's access to its property was prohibited. Plaintiff points to two "civil authority" orders issued by the State of Ohio. Doc. #32 at 21. The first, issued on March 17, 2020, "requir[ed] the

cancellation of non-essential or elective surgeries." Id. The second, issued on March 22, 2020, "requir[ed] the closure of non-essential businesses." Id. However, even the more restrictive of the two, requiring the closure of non-essential businesses, did not prohibit plaintiff's access to its dental office. Rather, the March 22, 2020, order included an exception for "Healthcare and Public Health Operations." Ohio Department of Health, Director's Stay at Home Order 3 (Mar. 22, 2020), https://governor.ohio.gov/media/news-and-media/ohio-issues-stay-at-home-order-and-new-restrictions-placed-on-day-cares-for-children. The order permitted individuals to "leave their residence to work for or obtain services through Healthcare and Public Health Operations[,]" which was defined to include "dental offices[.]" Id. Accordingly, plaintiff has not sufficiently alleged that access to its property was prohibited.

Additionally, the Second Circuit has considered the question of whether closure orders issued due to COVID-19 trigger coverage under a Civil Authority Provision identical to the Civil Authority Coverage in the Policy at issue. See 10012 Holdings, Inc., 21 F.4th at 223; see also Complaint, 10012 Holdings, Inc. v. Hartford Fire Insurance Company, et al., No. 1:20CV04471(LGS) (S.D.N.Y. Jun. 11, 2020), ECF No. 1 at 6 (Complaint including the full text of the Civil Authority policy language). In 10012 Holdings, Inc., the Second Circuit held:

> [C]overage under the Civil Authority provision, which,
> as previously noted, also requires a "Covered Cause of
> Loss" damaging property, is contingent on showing that
> the civil authority orders -- here, the executive orders
> issued by the Governor -- resulted from a risk of direct
> physical loss to property in the vicinity of the gallery.
> But the executive orders were the result of the COVID-
> 19 pandemic and the harm it posed to human beings, not,
> as "risk of direct physical loss" entails, risk of
> physical damage to property. Shuttering a gallery
> because of possible human infection does not qualify as
> a "risk of direct physical loss."

21 F.4th at 223. The same is true here. Accordingly, plaintiff

is not eligible for Civil Authority Coverage under the Policy.

## VII. <u>CONCLUSION</u>

For the reasons stated herein, defendant's Motion to

Dismiss [**Doc. #39**] is **GRANTED**.

The Clerk shall close this case.

It is so ordered at New Haven, Connecticut, this 1st day of

March, 2022.

                    /s/
                    _____
                    HON. SARAH A. L. MERRIAM
                    UNITED STATES DISTRICT JUDGE